CARTER PRODUCTS, Inc., et al. v. FEDERAL TRADE COMMISSION.

No. 10008.

United States Court of Appeals Seventh Circuit.

Feb. 2, 1951.

William L. Hanaway, New York City,. and Breed, Abbott & Morgan, New York City, for Petitioners.

W. T. Kelley, General Counsel, James W. Cassedy, and Donovan Divet, Special Attys., all of Washington, D. C., A. B. Hobbes, Washington, D. C., for Federal Trade Commission.

Before MAJOR, Chief Judge, DUFFY and LINDLEY, Circuit Judges.

DUFFY, Circuit Judge.

Petitioners ask us to review and set aside a cease and desist order entered by the Federal Trade Commission against petitioners, charging them with engaging in unfair and deceptive acts and practices in commerce in violation of the Federal Trade Commission Act, 15 U.S.C.A. § 45.

Petitioner Carter Products, Inc., sells and distributes in interstate commerce a deodorant cosmetic preparation called Arrid. The other petitioner is Carter's advertising agency. By means of various types of advertising, petitioners have represented that Arrid "safely stops underarm perspiration * * * instantly stops perspiration one to three days * * * remember, it stops perspiration and keeps it stopped * * * for one to three days;"

and also, "If you want complete under-arm protection, you must keep the armpits dry as well as odorless. Arrid cream will do both for you, and do it safely." Petitioners also advertised that Arrid is harmless and will not irritate the skin even if used after shaving, and that by stopping the flow of underarm perspiration altogether, the collection of odor-creating body secretions in the armpits is prevented. The Commission found that the foregoing statements and representations are grossly exaggerated, false, deceptive and misleading. The Commission also found that certain of said advertisements meant that the application of Arrid to the area of skin under the arms will terminate and bring to an end the flow of perspiration in that area for one to three days.

Although often used interchangeably, the terms "sweat" and "perspiration" are not identical, and do not define or describe the same thing. Located beneath the surface of the skin are glands known as sweat glands, each having an opening or duct at the surface of the skin, referred to as the mouth of the sweat gland. "Sweat" is the substance which is formed in the sweat glands before it appears on the surface of the skin. In a general sense, "perspiration" means any secretion which passes through the skin, which would include a secretion which passed through at a place where no sweat glands were located. In a more restricted sense, and as the term generally is used, "perspiration" refers to the secretion of the sweat glands after it passes through the skin and appears on the surface thereof, plus accumulated dirt or debris which has collected on the skin from various sources, and when both are left on the surface of the skin, the combination generates an odor characterized as the odor of sweat. Perspiration is either sensible (which can be seen or felt) or insensible (which can neither be seen nor felt).

The principal active ingredient of Arrid is aluminum sulphate, an astringent. When applied to the skin it tends to cause a swelling which contracts or closes the mouths of the sweat glands, and thus reduces the flow of such glands. Later the swelling gradually decreases, permitting sweat to flow again from the glands.

The Commission found that the extent of the reduction of the flow of sweat depends upon the temperature, the humidity, the physical activity of the individual, and the degree of tendency to perspire peculiar to the particular individual. The Commission further specifically found, "The use of 'Arrid' will not terminate or bring to an end the flow of underarm perspiration. Its use will not absorb perspiration to the extent of keeping the armpits dry. It will not keep the armpits dry or free from the odor of perspiration for one to three days. This preparation is not harmless, and its use will cause skin irritations, and dermatitis in some people. If used after shaving 'Arrid' is not safe and harmless, but is capable of irritating the skin, and of aggravating irritation."

Petitioners were ordered to cease and desist from disseminating in commerce any advertisement which represented "(a) that the application of said preparation stops underarm perspiration, or that it will be more than temporarily effective in reducing the flow of perspiration; (b) that said preparation will be more than temporarily effective in keeping the armpits dry or odorless; (c) that the use of said preparation immediately after shaving will not irritate the skin [1]; (d) that the said preparation will be more than temporarily effective in preventing the accumulation of odor-creating body secretions or excretions in the armpits; (e) that said preparation is safe or harmless to use, without disclosing it may cause irritation of sensitive skin."

As a product having antiperspirant properties Arrid does have some merit. All witnesses who testified on the subject agreed that Arrid did stop the appearance of perspiration on the surface of the skin of most people for certain periods. Two doctors testified the use of Arrid would have this effect for three to six hours; another stated it had such effect for a minimum of three to four hours; one

1. No question is raised on this appeal as to the propriety of Clause (c).

doctor testified that such effect would continue six to fourteen hours, and another doctor from four to twenty-four hours.

Sweat glands function most of the time in at least some small degree in all human beings, but much of the time the secretion produced is so small in amount that it dries off too quickly for a person to see or feel any of the secretion. However, we are not here concerned with whether it is possible to stop entirely the functioning of the underarm sweat glands, which would seem theoretically impossible. Petitioners did not use the word "sweat" in their advertising. The reasonable interpretation of the average person reading their advertisement that Arrid would stop perspiration was that they were representing that Arrid would stop the appearance and odor of moisture on the underarm skin. Their use of the word "stop" was ambiguous, however. If we say a person is dead because he has "stopped breathing," there is a connotation of permanence about the word "stopped"; but if when driving an automobile a person "stopped for a traffic light," the connotation of "stopped" would be of a temporary nature. Dictionary definitions of "stop" include "to cause to cease; to suppress; check; hold back; to arrest the progress or action of."

As stated heretofore, the evidence discloses that the use of Arrid will reduce the appearance of perspiration on the skin for a number of hours, to a point where it cannot be seen or felt. Of course the length of time that this situation prevails differs with each person and the existing circumstances. But the statement in the advertisements that Arrid will stop perspiration from one to three days was unjustified, as well as that its use would stop the flow of underarm perspiration "altogether."

Petitioners insist that they have never claimed that Arrid produced a permanent antiperspirant effect. Arrid is marketed in jars containing slightly more than one ounce of the product. Directions for use have appeared on packages and labels of Arrid, as follows (since 1939):

"Cover arm pit. Rub gently until cream vanishes. Wipe off excess. Use daily if necessary." Also, "Use frequently as you find necessary." And (since 1946), "Use daily for constant protection."

█ Petitioners argue that they made no greater claim than that the product, when used as directed, would stop the appearance of perspiration on the surface of the skin for a reasonable length of time. However, this contention of petitioners cannot be sustained. Petitioners did a considerable amount of advertising over the radio. At the first contact between buyer and seller, the buyer had no means of knowing that the directions printed on cartons and jars containing Arrid called for "daily" use or "as frequently as * * necessary." The same would hold true as to newspaper or magazine advertising. The law is violated if the first contact or interview is secured by deception, Federal Trade Comm. v. Standard Education Society, 302 U.S. 112, 115, 58 S.Ct. 113, 82 L.Ed. 141, even though the true facts are made known to the buyer before he enters into the contract of purchase. Progress Tailoring Co. v. Federal Trade Comm., 7 Cir., 153 F.2d 103, 104, 105. See also: Aronberg v. Federal Trade Comm., 7 Cir., 132 F.2d 165, 169.

Thus we are here confronted with a situation where the distributors of Arrid, a product of some merit, made claims in their advertising which were too sweeping and too broad in their scope. Further, petitioners' use of the word "stop" was ambiguous. The approach of the Commission is to interpret "stop" as connoting permanency. The Commission has previously held that certain words connote permanency. In International Parts Corp. v. Federal Trade Comm., 7 Cir., 133 F.2d 883, 884, the advertisement for an automobile muffler stated, "Finest Quality Metallic Finish Prevents Rust and Corrosion." The Commission made a finding that the word "prevents" implies permanency, and therefore its use in that advertisement was misleading to the public. This court vacated the Commission's cease and desist order, and held that the idea of permanency was improperly interpolated by the Commission, and that without such interpolation there was no misrepresentation. Also in D. D. D. Corp. v. Federal Trade Comm., 7 Cir.,

125 F.2d 679, the Commission construed the claim of relief from itching as promising a permanent effect, for it ordered the manufacturers of D. D D. to discontinue representing that the pioduct would have more than a temporary effect in relieving itching. But this court, on appeal, ruled 125 F.2d at page 682: "We are also of the view that the word 'temporary' as used in Paragraphs 1(a), (b), (c), (e) and (g) of the Commission's order should be eliminated. We see no reason why petitioner should not be permitted to represent its product as a relief for itching. It does not cure either the itch or its cause, but it does afford relief. One of the definitions given by Webster for the word 'relief' is 'lessens evil, pain, etc.' The words 'relief from itching' could, in our minds, carry no implication to the public that the product was a permanent cure either for the symptom or the disease. The word 'temporary' carries an uncertain meaning. As the Commission's doctor stated: 'It might mean a few minutes, or an hour or so.' To require its use would serve no purpose in the protection of the public, but might limit petitioner in truthfully representing its product."

There is some indication that the attitude of the Commission as to the connotation to be given to the word "stop" in advertising may have changed since the date of the decision in the case at bar. In the five anti-histamine cases[2], the Commission on July 5, 1950, approved stipulations prohibiting each manufacturer from representing that its product would cure, prevent, stop, or shorten the duration of the common cold, which stipulations included the following permission: "Provided, however, that nothing therein shall prevent the respondent from representing (a) that the use of the product relieves or checks and, in many cases, *stops* the symptoms or manifestations of the common cold, such as sneezing, or nasal congestion, simple throat coughs, watering eyes, or watery or mucuous discharge from the nose * * *." (Emphasis added.) Petitioners herein claim that all they want to do is claim that Arrid stops the appearance of perspiration, which is the manifestation of the operation of the sweat glands.

█ Paragraph 1(a) of the cease and desist order will be modified by the elimination of the clause, "or that it will be more than temporarily effective in reducing the flow of perspiration," and by adding at the end of the undeleted portion of such, subsection the following underscored words, so that the subsection will read: "(a) That the application of said preparation stops underarm perspiration; provided, however, that nothing herein shall prevent the respondent from representing that the use of Arrid will prevent the appearance of perspiration when used as directed, namely, 'daily' or 'as frequently as you find necessary.'"

Paragraph 1(b) of the Commission's order requires petitioners to refrain from representing that Arrid will be more than temporarily effective in keeping the armpits dry or odorless, and Paragraph 1(d) from representing that Arrid will be more than temporarily effective in preventing the accumulation of odor-creating body secretions or excretions in the armpits. Petitioners strongly urge that there was no justification for the Commission to pass upon the deodorant qualities of Arrid, because such deodorant qualities were not in issue. Petitioners point out that in the Commission's complaint Arrid was referred to as "a deodorant cosmetic preparation," and that respondents admitted this allegation of the complaint in their answer. Petitioners quote dictionary definitions defining "deodorant" as a substance which destroys offensive odors. Petitioners argue that the Commission cannot controvert issues of its complaint which are admitted by the answer, citing Hill v. Federal Trade Comm., 5 Cir., 124 F.2d 104, 106, and National Candy Co. v. Federal Trade Comm., 7 Cir., 104 F.2d 999, 1003. They point out that the deodorant properties of Arrid are entirely different from its antiperspirant properties, that many deodorant substances do not have any antiperspirant properties at all, and that no deodorant has a permanent ef-

2. To appear, when reported, in 47 F.T.C.Rep., pp. 001, 005, 0010, 0014, 0018.

fect and that petitioners made no such claim as to Arrid. In sum, petitioners assert that as the Commission alleged and thus admitted Arrid was a deodorant and that everyone knows that a temporary effect is characteristic of a deodorant, the public could not possibly be defrauded or deceived, and that the Commission has gone out of its way to destroy a legitimate advertising claim.

We think it was permissible for the Commission to consider and pass upon whether the advertising claims of Arrid as a deodorant were deceptive, false or misleading. It is the perspiration remaining on the skin of a human being which causes an unpleasant odor, and since stopping the odor of perspiration is so dependent on reducing the perspiration itself, that is, when the deodorant is of the type of Arrid, the Commission could not very well have treated each as distinct and unrelated matters, and investigated one and passed over the other. The testimony of the medical experts who were experienced in dermatology, as to the length of time that Arrid would remain effective as a deodorant, varied, to wit, "three to six hours," "ten to twelve and maybe fourteen hours," "four to ten hours," "four to twenty-four hours," and "fifteen to twenty hours."

The statute gives this court power not only to affirm or to reverse, but also to modify the orders of the Commission. 15 U.S.C.A. § 45(c) and (d). This power to modify extends to the remedy. Federal Trade Comm. v. Royal Milling Co., 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706. However, the Supreme Court has pointed out that judicial review by a Court of Appeals, is limited, and extends no further than to ascertain whether the Commission has made "an allowable judgment in its choice of the remedy." Jacob Siegel Co. v. Federal Trade Comm., 327 U.S. 608, 612, 66 S.Ct. 758, 760, 90 L.Ed. 888.

As stated heretofore, this court in D. D. D. Corp. v. Federal Trade Comm., supra, disapproved of the use of the word "temporary" because of its very uncertain meaning. We pointed out that it might mean only a few minutes, yet experts testifying before the Commission in this case admitted that Arrid's deodorant properties are effective at least three to six hours. We think in the case at bar, as we did in the D. D. D. case, that protection of the public does not require petitioners to use the word "temporary" or "temporarily," and that to require its use would be unfair to the petitioners in representing the truth as to Arrid.

Paragraph 1(b) of the Commission's cease and desist order will be deleted, and in lieu thereof the following shall be inserted: "(b) That said preparation will keep the armpits dry or odorless, provided that nothing herein shall prevent respondents from representing that the use of Arrid will keep the armpits dry or odorless when used as directed, namely, 'daily' or 'as frequently as you find necessary.' "

And Paragraph 1(d) will be deleted also, and in lieu thereof the following shall be inserted in the Commission's order: "(d) That said preparation will prevent the accumulation of odor-creating body secretions or excretions in the armpits, provided that nothing herein shall prevent respondents from representing that the use of Arrid will prevent the accumulation of odor-creating body secretions or excretions in the armpits when used as directed, namely, 'daily' or 'as frequently as you find necessary.' "

Paragraph 1(e) of the Commission's order requires that petitioners cease and desist from representing that "said preparation is safe or harmless to use, without disclosing that it may cause irritation of sensitive skin." Petitioners presented evidence showing that the experiment of one doctor, involving a daily application of Arrid on 27 women for a two-week period, revealed none had any sign of skin irritation; and that another doctor experimented with such applications on 186 women, and that again the skin of none of them showed any sign of irritation. Petitioners contend that the evidence clearly shows that the use of Arrid will not produce harmful effects upon normal skin, and that they should have the right to say so in their advertisements;

and they requested the Commission to permit them to so advertise. In our opinion the Commission might well have granted petitioners' request; but since it did not, we feel that we cannot overrule the Commission's order in this respect, because we are convinced that the Commission made "an allowable judgment in its choice of the remedy." Jacob Siegel Co. v. Federal Trade Comm., supra. The evidence proved that Arrid had caused and may cause injury to a number of people, and that such injury is not confined to persons having allergies or idiosyncracies. One medical expert testified that during the course of ten years he had treated fifty cases of dermatitis proved to have been caused by Arrid. There was, therefore, substantial evidence sustaining the finding, "This preparation is not harmless, and its use will cause skin irritations, and dermatitis in some people." It follows that Paragraph 1(e) of the Commission's cease and desist order should stand, and be enforced.

The cease and desist order is affirmed, as modified herein, and the enforcement of the order as modified is

Ordered.