George KURZON d/b/a Uxbridge Products Company, Plaintiff-Appellant,

v.

UNITED STATES POSTAL SERVICE, Defendant-Appellee.

No. 75–1378.

United States Court of Appeals, First Circuit.

June 21, 1976.

Sheldon S. Lustigman, New York City, for appellant.

William A. Brown, Boston, Mass., and Morton Hollander, Washington, D.C., for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Appellant Dr. George Kurzon brought this suit in the district court to enjoin enforcement of a mail stop order. Under 39 U.S.C. § 3005 [1] the Postal Service had determined after formal hearing that appellant was "engaged in a scheme or device for obtaining money or property through the mails by means of false representations . . . ."; and had ordered the Boston postmaster to stop all related mail addressed to appellant and to return it stamped, "Return to Sender; Order Issued Against Addressee for Violation of False Representation Law." [2] The district court, to which appellant turned under 5 U.S.C. § 703; 28 U.S.C. § 1339; and 39 U.S.C. § 409, denied the injunction. Appellant thereupon filed this appeal.

I

As owner of the Uxbridge Health Products Company and the Uxbridge Products Company, Dr. Kurzon has for some time sold a non-prescription drug product trade-named Prostex through the mail. Prostex is a combination of three amino acids, glycine, alanine and glutamic acid, and is sold as a remedy for the symptoms of benign prostatic hypertrophy (BPH). BPH, according to the evidence before the Postal Service, is a condition of enlargement of the prostate gland in older men that tends to compress the urethra; its symptoms include difficulty in voiding, frequency of urination, urgency to urinate, nocturia, and dribbling after urination.

The Prostex formula has been on the market under various names since 1950, and is apparently still available over the counter in retail pharmacies.[3] The claims made for the drug have, however, undergone a transformation. The early advertising gave the impression that the drug would effectively treat the condition of prostate enlargement, whether benign or malignant. This came to an end in 1960, when the Post Office (as it was then known) complained that the advertising was fraudulent and sought a mail stop order under former 39 U.S.C. §§ 259 & 732 (1952), the precursors of § 3005. The proceedings resulted in a settlement by which United Pharmical Corp., the manufacturer, agreed to disclose in all mailed advertising that the product "should be used only in the treatment of benign prostate hypertrophy after proper diagnosis by a physician."

Two years later this disclosure itself came under attack, this time by the Food and Drug Administration. The FDA charged that the product was misbranded in violation of 21 U.S.C. §§ 331(a) & 352 [4] in that

1. 39 U.S.C. § 3005(a) authorizes issuance of a stop order:
   "[u]pon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations. . . ."

2. The stop order excludes mail that the postmaster determines from "the face of its wrapper" is unrelated to the violation. It directs the postmaster to retain all other mail for at least two working days and to afford the addressee an opportunity to examine it in that period. The addressee may receive any mail that, upon examination, proves to be either (1) unrelated or (2) a refund request or a return of merchandise. The order also forbids payment of any Postal Money Order to the violator in connection with the violation.

3. Counsel for Dr. Kurzon so informed the district court in oral argument.

4. A drug is misbranded "[i]f its labeling is false or misleading in any particular," 21 U.S.C. § 352(a), or if its labeling fails to bear "adequate directions for use", id. § 352(f)(1). Introduction of a misbranded drug into interstate commerce is prohibited, id. § 331(a), and may be enjoined by the district court, id. § 332.
   "Labeling" includes all representations on or accompanying the drug or its container. Id. § 321(m); see id. § 321(n).

its labeling was "false or misleading". In *United States v. Metabolic Products Corp.*, C.A. No. 61–570–S (D.Mass.1962), the district court agreed and enjoined sale of the drug in interstate commerce for as long as its labeling suggested "that the drug is adequate or effective in the treatment of hypertrophy of the prostate in man, or for the prevention of cancer of the prostate in man." The court observed in its opinion that in light of what was then known about the drug the most that could be claimed for it was "that it relieves merely the symptoms which indicate prostate disorder . . . . ."

Dr. Kurzon became interested in Prostex following the decision in *Metabolic,* and claims to have designed Prostex's present labeling and advertising with the decision in mind. The label affixed to the drug's container now states that it is "[f]or relief of symptoms of Benign Prostatic Hypertrophy such as frequency, nocturia, continence of urine, urgency and dribbling. . . . " It cautions that the drug is "[f]or symptomatic relief only" and is not intended "as a cure or treatment of cancer or any other disease."

The advertising is more elaborate. To initiate interest in Prostex, Dr. Kurzon used the following newspaper advertisement:

"MEN: If You
GET UP NIGHTS
get *PROSTEX*

Sleep disturbing discomforts such as getting up nights, frequent daily discomfort, dribbling, urgency, and undue retention are now relieved by *PROSTEX.* This now famous formula is also used by many doctors.

Read the complete fascinating story on how it was discovered and details of its use. Send for free literature today.

UXBRIDGE HEALTH PRODUCTS CO.

Dept. 26, 84 State Street, Boston, Ma 02109"

Those who responded to this advertisement would receive a pamphlet, consisting of a single sheet of paper printed with three columns on each side and folded so that each column fills a single page. The front page, as the pamphlet is folded, introduces Prostex with the following characterization, in large type: "A proven scientific formula of pure food substances for relieving the symptoms of benign prostate hypertrophy." The back page, which bears the address of the Uxbridge Health Products Company and gives the price of the product, prominently displays the following message:

"CAUTION

Of course, before using PROSTEX for relief from symptoms such as frequency, nocturia (getting up nights), continence of urine (abnormal retention), dribbling, and other discomforts, you should make sure through a medical examination that your urinary difficulties are caused only by prostate hypertrophy and not by cancer of the prostate. The cause of either ailment is not known. The one does not cause the other. The two conditions may co-exist."

Following that is the warning, in bold print, *"Be sure to consult your Physician".*

The four interior pages provide detailed textual and graphic information about Prostex and its effects. The first three of these pages define BPH and its symptoms; describe Prostex and its amino acid composition; recount the "discovery" of the drug's effect on BPH symptoms and the subsequent studies that purported to confirm the discovery; and speculate on possible explanations for Prostex's effectiveness. The last of the interior pages, which is framed for emphasis, highlights the claimed advantages of Prostex:

"Several experienced physicians state that the great majority of cases of Benign Prostatic Hypertrophy may well be amenable to conservative measures. The use of PROSTEX capsules indicates many advantages:

PROSTEX capsules may be used with expected benefit in most cases of Benign Prostatic Hypertrophy.

PROSTEX capsules effectively relieve the urinary frequency, abnormal retention, urgency, nocturia, and dribbling.

PROSTEX capsules often provide dramatic results in cases with high urinary frequency, nocturia, and urgency, in 2 to 4 weeks.

PROSTEX capsules are safe. They are not toxic, cause no side reactions and have no contraindications when eating is allowed."

On the same page, the claims for early and prolonged relief are qualified as follows:

"Although many persons using PROSTEX receive early benefit, you should not expect immediate help. PROSTEX is composed of pure nutritional factors which, of course, require some time for full performance. The beneficial results are usually gradual over a period of weeks.

After discontinuing use of PROSTEX, prolonged relief of the urinary discomforts is often experienced. In the future, should identical symptoms again occur, PROSTEX may be resumed if a medical examination indicates the discomforts are still due to Benign Prostatic Hypertrophy."

The Postal Service complaint charged that the advertising for Prostex falsely represented the product's effect, thereby inducing mail-order purchases in violation of § 3005. Three representations were singled out as materially false:

"(a) That "Prostex" will relieve male:

1. frequency of urination;

2. urgency to urinate;

3. nocturia;

4. pain and burning during urination;

5. feeling of fullness and pressure in the perineum and bladder;

6. dribbling after urination;

7. abnormal retention;

(b) That the effects enumerated in subparagraph (a) *supra*, will be noticeable in 2–4 weeks;

(c) That the relief of the symptoms enumerated in subparagraph (a), *supra*, will be prolonged even after the use of "Prostex" is discontinued . . . .."

Apart from the advertising materials, the evidence before the Postal Service consisted primarily of the testimony of medical experts for both sides. There was general agreement that BPH is a condition of unexplained enlargement of the prostate in older men whose symptoms are as the advertising for Prostex described; that a number of other conditions—including urinary tract infections, congenital anomalies, and cancer of the prostate—cause the same or similar symptoms (without necessarily enlarging the prostate);[5] and that where the cause of the symptoms is not BPH but some other problem, Prostex is ineffective and medical treatment advisable.

The experts disagreed on the question whether Prostex would relieve the symptoms of BPH. The Government presented the testimony of two witnesses, a nutritionist and a urologist. While neither of the two had tested the drug, their testimony tended to establish that as a matter of sound and current medical theory an amino-acid combination like Prostex could not and would not relieve the symptoms of BPH. On the other side, Dr. Kurzon relied primarily on the testimony of two practicing physicians who testified to their own observations. One of these physicians, Dr. Gant, testified that he had discovered the drug's effect inadvertently while practicing at the Massachusetts General Hospital and had later confirmed in his practice and in a published study that the drug relieved the symptoms of BPH. The other, Dr. Hewitt, who had worked under Dr. Gant at one time, testified to having observed the drug's beneficial effect on BPH symptoms both in himself and in numerous patients.

---

5. Dr. Miller, the urologist who testified for the Government, offered a simple explanation:

"The prostate [when enlarged] produces symptoms . . . because it constricts the urethra, so anything else that will constrict the urethra will give the same sort of symptoms."

In addition to Dr. Gant's publication, Dr. Kurzon introduced a study written by a Dr. Damrau, who did not testify in person, purporting to confirm Dr. Gant's conclusion. The Government's urologist, Dr. Miller, testified to defects in both studies that in his view rendered the results unreliable.

The presiding judicial officer for the Postal Service apparently had difficulty resolving this conflict between the theoretical evidence that the drug would have no effect and the empirical evidence that relief of BPH symptoms had been observed. Although he agreed with the Government that the studies on which Dr. Kurzon had relied were not "objective" and suggested that the observations of Dr. Kurzon's witnesses were tainted by the "preconceptions of those who hold strong views as to particular modes of therapy", he made no finding that we can identify as adopting the Government's view that the drug can have no effect on BPH symptoms, and instead asserted,

"[I]t is not necessary to determine whether on the question of the truth or falsity of the representation of whatever effectiveness Prostex may possess scientific evidence or empirical observation of medical practitioners is to be accepted as most probative. It would appear, however, that, whether Prostex is as effective as claimed by Respondents or as ineffective as claimed by Complainant, the phenomenon should be capable of being established by objective tests. . . . On the record here made such tests are completely lacking."

While the judicial officer thus seemed to stop short of adopting the views of the Government experts, he found that the advertising for Prostex went beyond what even the credible observations of Dr. Kurzon's experts tended to show. Specifically, as we read his opinion, the judicial officer found the advertising misleading in three respects: (1) it suggested that Prostex would relieve such symptoms as frequency and urgency of urination in men *in all cases* as long as the cause was not cancer, while in fact the drug would relieve the symptoms—if ever—only in the limited case where the cause was unexplained enlargement of the prostate, i. e., BPH; (2) it falsely represented that relief would be noticeable in two to four weeks; and (3) it falsely represented that relief would be prolonged after use of Prostex was discontinued. On the basis of these findings, the officer ruled that the conditions of § 3005 had been satisfied and issued the present order stopping Dr. Kurzon's mail.

In seeking injunctive relief from the district court, Dr. Kurzon challenged the validity of the order essentially on two grounds: first, that it and the findings on which it rested were unsupported by substantial evidence; and second, that it was contrary to, and precluded by, the terms of the United Pharmical settlement in 1960 and the *Metabolic* decision in 1962. The district court upheld the order against these objections. In so doing it seems to have understood the judicial officer to have found definitively that Prostex would afford no symptomatic relief even in genuine cases of BPH. We affirm, but on a more limited reading of the agency's findings.

II

Before we consider the merits of Dr. Kurzon's two-pronged attack on the Postal Service order, we must establish the grounds upon which the order rests. For "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. . . ." *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). In making this threshold determination, we are guided by two principles. The first is that "we must look to [the agency's] opinion, not to the arguments of its counsel, for the underpinnings of its order. . . ." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 246, 92 S.Ct. 898, 906, 31 L.Ed.2d 170 (1972). The second is that while we "ought not to have to speculate as to the basis for an administrative agency's conclusion," *Northeast Airlines,*

*Inc. v. CAB,* 331 F.2d 579, 586 (1st Cir. 1964), we will accept "less than ideal clarity" in administrative findings, "if the agency's path may reasonably be discerned. . . ." *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

The problem here is to determine the extent to which the Postal Service found Prostex ineffective in ruling that its advertising was misleading. The district court apparently believed that the Service had found the drug totally ineffective in relieving the symptoms described in its advertising; the court spoke of "the Acting Judicial Officer's finding that Prostex has no effect on the treatment of the symptoms of BPH. . . ." We are unable to identify any such finding in the judicial officer's opinion. While the opinion is not free from ambiguity, we think it evidences a clear intent to leave the question of Prostex's effect on BPH symptoms unresolved and to rest on the narrower grounds that we have already enumerated.

The most obvious indication that the Postal Service stopped short of finding Prostex without any therapeutic effect is the passage we have already quoted, to the effect that it was "unnecessary to decide" whether the "scientific" evidence against the drug was more probative than the "empirical" evidence in its support. The Government seeks to explain this away by equating the further finding that objective tests of the drug's performance were lacking with a finding of complete ineffectiveness. We decline to adopt such an equation. The question whether this drug may be marketed with more modest claims of effectiveness or may not be marketed at all is not one that should depend on inference

from comments on the nature of the evidence. Too much is at stake to permit an agency—especially one without any special claim to scientific expertise—to pronounce a drug product to be of no therapeutic value without doing so explicitly. Moreover, there is no basis for the inference that the Government would have us draw. Nothing in the Postal Service statute or regulations prevents the promoter of a harmless drug from relying on the observations of medical practitioners who have found the drug effective—at least so long as he does not represent that the observations are borne out by objective tests when they are not.[6] We read the finding here that such tests were lacking merely as a comment that the best evidence on the question of effectiveness was not available, a further reason to leave the question open for the time being.

Another indication that the Postal Service order was meant to rest on narrower grounds is the judicial officer's extensive discussion of those grounds, especially as contrasted with its almost cryptic reference to the conflicting evidence on whether Prostex would relieve the symptoms of BPH. The findings on early and prolonged relief may, of course, be explained as mandated by the form of the administrative complaint, which set forth the claims of early and prolonged relief as independent representations that would merit a stop order. But the extensive findings by which the judicial officer distinguished BPH from the various other causes of such symptoms as frequency and urgency of urination are another matter. After summarizing the causes of such symptoms, the officer found,

"Respondents' advertising lumps together all such phenomena except cancerous growth under the designation of benign hypertrophy of the prostate without

---

6. We note that under the Food, Drug, and Cosmetic Act, by contrast, the absence of objective tests would be sufficient to demonstrate the inefficacy of a "new drug" for which premarketing clearance by the Food & Drug Administration is required. 21 U.S.C. §§ 321(p), 355(d), (e). As a drug that was already on the market in 1962, however, Prostex may escape regulation as a "new drug". *See Weinberger v. Ben-*

*tex Pharmaceuticals, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); 21 U.S.C. § 321 note (1970).

While the Prostex advertising brochure arguably leaves the impression that all of its claims of effectiveness are supported by objective studies, the judicial officer made no finding to that effect.

alerting its prospective purchasers to the dangers of infection or the other conditions which may cause it and may require medical attention to avoid dangers to the purchaser's health."

Later he reiterated that "Respondents represent that the use of Prostex to relieve the symptoms of prostate hypertrophy is proper in all non-cancerous cases. . . . " This representation, he found, was "materially false in fact" because "infection and other mentioned causes require treatment of the infection or other cause if obvious medical complications are to be avoided." The officer keyed this finding to the first paragraph of the administrative complaint, which had broadly alleged that the advertising was false in its representation that Prostex would relieve frequency of urination, urgency to urinate, and other related symptoms.

It would hardly be necessary to explain at such length that the advertising for Prostex exaggerated the circumstances under which it would work if in fact it would never work and the Postal Service order was meant to rest on that broad ground. On the contrary, all the evidence suggests that the judicial officer meant to eschew the broad finding ascribed to him by the district court. We therefore construe the Postal Service opinion as leaving open the question whether Prostex relieves the symptoms of BPH and as resting instead on the narrower grounds that the advertising overstates both the circumstances in which the drug will work and the timing of relief.[7]

### III

■ Construing the administrative findings in this manner, we agree with the district court that there is substantial evidence to support the Postal Service order. Section 10(e) of the Administrative Procedures Act provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence . . . ." 5 U.S.C. § 706(2)(E). It also provides that "[I]n making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." Id. § 706. With this standard of review in mind, we turn first to the findings relating to the timing of relief.

The judicial officer found that the advertising for Prostex represented that relief would be "noticeable in two to four weeks" and would often be "prolonged after use of Prostex is discontinued." He found both representations false because there was no reliable evidence to support them.

These findings fairly characterize the thrust of the advertising claims as to the timing of relief. While there was qualifying language as set forth above, the judicial officer was entitled to find that such language would have little probable effect on the ordinary reader, see Donaldson v. Read Magazine, 333 U.S. 178, 189, 68 S.Ct. 591, 92 L.Ed. 628 (1948), and that the overall impression would be that relief would be noticeable in two to four weeks and prolonged after use of Prostex was discontinued.

The judicial officer could find such claims false on the record before him. As the district court noted, the Government's medical evidence tended to show that no matter how long it was used, Prostex would have no effect on symptoms such as fre-

---

7. The question whether Prostex has any effect on the symptoms of BPH is unlikely to remain unresolved long, as the Food & Drug Administration is currently engaged in a review of the labeling claims of all over-the-counter drugs. See 37 Fed.Reg. 9464 (May 11, 1972). The judicial officer may well have had this review in mind when he chose to leave the question open. While the Postal Service's jurisdiction overlaps that of the FDA in this respect, its determination would not be binding on the FDA, see United States v. 3963 Bottles, More or Less, etc., 265 F.2d 332, 334–35 (7th Cir. 1959); United States v. 42 Jars, More or Less, etc., 264 F.2d 666, 668–69 (3d Cir. 1959); cf. United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). The Federal Trade Commission, whose jurisdiction over false advertising similarly overlaps with the FDA's responsibility for drug labeling, cf. Warner-Lambert Co. v. FTC, 361 F.Supp. 948 (D.D.C.1973), has proposed to defer to the FDA on the truthfulness of drug-efficacy claims. 40 Fed.Reg. 52631 (Nov. 11, 1975).

quency of urination. In the face of this evidence, it was incumbent on Dr. Kurzon to come forward with evidence to support each of the challenged advertising claims. Where the rebuttal evidence was unreliable or unpersuasive in supporting a particular claim, the judicial officer was entitled to reject it and find for the Government. Although Dr. Kurzon's experts testified to early and prolonged relief consistent with the timing claims, their testimony in this respect was unconfirmed by the studies that purported to demonstrate Prostex's effectiveness, and the judicial officer chose to discount it. This was well within his province, and in view of the evidence of complete ineffectiveness we cannot say his findings that relief would be neither as rapid nor as prolonged as claimed are unsupported by substantial evidence.

We turn now to the findings that the advertising for Prostex exaggerated the circumstances under which it would afford symptomatic relief. The judicial officer found that the advertising suggested that the drug would relieve the described symptoms "in all non-cancerous cases." We do not understand Dr. Kurzon to deny that such a representation would be false; the evidence was in agreement that the drug would work—if it worked at all—only in cases where the sole cause of the symptoms was BPH. The question is rather whether there is substantial evidence to support the finding that such a representation was made.

We find ample support for the challenged finding in a reading of the most conspicuous parts of the total advertising appeal, the initial newspaper advertisement and the front and back pages of the mailed brochure. The initial advertisement never mentions, much less defines, BPH. Instead, it simply states, "Sleep disturbing discomforts, dribbling, urgency, and undue retention are now relieved by *PROSTEX.* . ." Those who are persuaded by this message to send for the brochure learn from the front page that Prostex relieves the symp-

toms of benign prostate hypertrophy, and from the back that they should make sure that the cause of their symptoms is prostate hypertrophy and not cancer.

This much of the advertising is enough to give the impression, as found by the presiding officer, that the symptoms described in the initial advertisement must derive from one of two sources, cancer or (presumably benign) prostate hypertrophy. One who is confident that he does not have cancer can also be reasonably confident, if he believes what he reads, that Prostex will relieve his symptoms. There is nothing in the interior pages of the brochure to dispel this misleading impression. The various other problems that can cause symptoms of the sort caused by BPH are never mentioned. BPH itself is defined only as "nonmalignant prostate hypertrophy."

Dr. Kurzon objects, however, that since the newspaper advertisement does not itself solicit money, it is beyond the scope of § 3005. The objection is without merit. Section 3005 by its terms reaches any "scheme or device for obtaining money or property through the mail by means of false representations . . . ." It does not say that the representations themselves must be mailed, or that only representations made in an advertisement that also solicits remittances may be considered. By the nature of Dr. Kurzon's marketing technique, only those who have first read the newspaper advertisement will have an opportunity to see the mailed brochure and order the product. But there is no assurance that those ordering the product have read the brochure, much less understood any fine-print qualifications of broad claims made in the initial advertisement. Even for those who read the brochure with some care, the claims that influenced them to acquire the brochure may well influence the message that comes through. In view of these considerations, we think the words "scheme or device" are easily broad enough to encompass the newspaper advertisement here.[8]

---

8. See *Exposition Press, Inc. v. FTC,* 295 F.2d 869, 873 (2d Cir. 1961), *cert. denied,* 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962).

" 'The law is violated if the first contact . . . is secured by deception . . ., even though the true facts are made known

Dr. Kurzon objects further that in reading the advertising to claim effectiveness for Prostex in too broad a range of cases, the judicial officer himself misunderstood the definition of BPH. Specifically, Dr. Kurzon argues that the judicial officer mistakenly believed that BPH was caused by other conditions such as infection, while the evidence of both sides established that BPH was an independent condition, albeit with similar symptoms. He claims that this misunderstanding infected the finding that his advertising exaggerated the circumstances in which Prostex would be effective.

While we agree that there is a problem of definition in the administrative opinion, the problem is not as fundamental as Dr. Kurzon suggests. A fair reading of the opinion reveals that the judicial officer understood in accordance with the record that BPH is a condition that is independent of, but produces symptoms similar to, such other problems as urinary tract or kidney infections. What he failed to understand was that many of those other problems are independent of the general condition of prostate enlargement. Thus he summarized Dr. Miller's testimony as follows:

> "He testified that prostate hypertrophy could be due to numerous causes, such as congenital anomalies, kidney infections, infection from venereal disease, congested prostatitis resulting from respiratory infections, edema of the bladder neck, in addition to benign hypertrophy, at issue here."

Dr. Miller had actually testified that such conditions as kidney infection or edema of the bladder neck result in symptoms similar to those caused by prostate enlargement, not that they result in prostate enlargement itself. The same error—locating in the prostate medical conditions that are

found elsewhere—was carried forward into the ultimate findings.[9]

But there is no indication that the judicial officer's overbroad definition of prostatic hypertrophy distorted his understanding of *benign* prostatic hypertrophy (BPH). In summarizing the record, for example, he noted the concession of one of Dr. Kurzon's witnesses that "the cause of benign prostatic hypertrophy was unknown . . . ." And in his ultimate findings, as we read them, he used the phrase "otherwise unexplained enlargement of the prostate" to define BPH in accordance with the testimony. Moreover, the ultimate reluctance of the judicial officer to foreclose the question whether Prostex has some effect on the symptoms of BPH is meaningful only if he understood BPH to be an independent condition.

With the judicial officer's confusion reduced to size, we agree with the Government that the error is harmless. While agency decisions must be sustained, if at all, on their own reasoning, *see SEC v. Chenery Corp., supra,* this principle "does not mechanically compel reversal 'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached.'" *Braniff Airways, Inc. v. CAB,* 126 U.S.App.D.C. 399, 379 F.2d 453, 466 (1967), *quoting Massachusetts Trustees of Eastern Gas and Fuel Associates v. United States,* 377 U.S. 235, 248, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964). Where a subsidiary finding is unfounded, the court will remand the case to the agency for further consideration only if "the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture. . . ." *NLRB v. Reed &*

---

to the buyer before he enters into the contract of purchase.'"
*Id., quoting Carter Products, Inc. v. FTC,* 186 F.2d 821, 824 (7th Cir. 1951).

9. "Hypertrophy of the prostate gland may be caused by several causes: malignant or cancerous growth; infection, especially from venereal or kidney diseases; congested prosta-

titis; congenital anomalies; otherwise unexplained enlargement of the prostate."
This is the apparent source of the Government's concession, which we find inaccurate, that the judicial officer "erroneously stated that these [other] conditions cause BPH which, in turn, causes the symptoms in question." Brief for Defendant-Appellee, at 9.

*Prince Mfg. Co.,* 205 F.2d 131, 139 (1st Cir.), *cert. denied,* 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); *see Communist Party of United States v. Subversive Activities Control Board,* 367 U.S. 1, 67, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); *Denton v. Secretary of Air Force,* 483 F.2d 21, 28 (9th Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974); *Braniff Airways, supra* at 465–67; *cf. Goldstein v. Middendorf,* 535 F.2d 1339, at 1344–1345 (1st Cir., 1976).

There is no such "substantial doubt" in this case. The misrepresentation that the judicial officer identified in Dr. Kurzon's advertising for Prostex was its suggestion that Prostex would relieve a certain set of symptoms whether the symptoms stemmed from BPH or from a number of other problems that would require medical treatment. That the officer mischaracterized these other problems as prostate hypertrophy is essentially irrelevant to the ultimate finding of false representation.

We might view the matter differently if Dr. Kurzon had called the mistake to the judicial officer's attention, asking for reconsideration, *see* 39 C.F.R. § 952.27, and the officer had then let the findings stand as first written. "Reconsideration is the obvious opportunity available to an agency to cope with defects appearing on its first consideration. . . ." *Braniff Airways, supra,* at 467. The confusion in the presiding officer's opinion is of the sort that is far more easily corrected by an agency than by a court, and an agency's failure to eliminate confusion such as this when asked to do so, would be a sure indication that the misunderstanding ran deep.[10] But so far as the record shows Dr. Kurzon never sought reconsideration by the Postal Service, and in the circumstances, we do not find prejudice.

## IV

■ Finally, we consider Dr. Kurzon's claim that the Postal Service is barred from making the instant charges against Prostex either by the 1960 United Pharmical settlement or by the 1962 *Metabolic* decision. The apparent premise of this claim is that common law principles of preclusion operate with full force in this context. We doubt that this is so. It has been said of the Federal Trade Commission's regulation of advertising that "new violations will support new proceedings dealing with different periods of time, at least where there is no indication of harassment . . . ." *Exposition Press, Inc. v. FTC,* 295 F.2d 869, 872 (2 Cir. 1961), *cert. denied,* 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962). Moreover, Congress has expressly authorized revision of efficacy determinations by the Food and Drug Administration where new information is available about a drug for which premarketing clearance is required under the Food, Drug and Cosmetic Act. 21 U.S.C. § 355(e)(3). The same flexibility may well be available where false advertising charges by other agencies turn on determinations of drug efficacy, at least where the FDA has not acted.

We do not rest upon such considerations here, however. They were not raised by the Postal Service, and the 1960 settlement and the 1962 decision, taken on their own terms, do not in any event present obstacles to the present Postal Service order.

The 1960 settlement grew out of a Post Office complaint seeking a mail stop order against United Pharmical in connection with its sale of a Prostex predecessor named "Urex". The claims then made for Urex went well beyond those now made for Prostex, suggesting that the product might even be of value in the treatment of malignancy of the prostate. On the other hand, the then applicable law, 39 U.S.C. §§ 259, 732 (1952), imposed a greater burden on the Post Office; to secure a stop order, it had to show not only that advertising claims were false, but also that they were made with an intent to deceive. In this context the Post Office agreed to suspend the stop

---

**10.** We do not, of course, suggest that the losing party in agency adjudication should file a motion for reconsideration in every case. *See*

*Welch & Corr Constr. Co. v. Wheeler,* 470 F.2d 140, 151 (1st Cir. 1972).

order proceedings in return for United Pharmical's agreement to disclose that the product "should be used only in the treatment of benign prostate hypertrophy after proper diagnosis by a physician." Significantly, United Pharmical expressly agreed that the settlement would neither bar additional proceedings under §§ 259 and 732 "based upon changed facts or circumstances in the opinion of the General Counsel or his representative" nor "act as a defense or relieve the undersigned of responsibility for violation of any other statute."

Whatever else may be said about this settlement, it seems plain that any obligations incurred by the Post Office have since been vitiated by both changed circumstances and new legislation. For changed circumstances, there is no need to go beyond the 1962 *Metabolic* decision. In establishing that Urex was not effective in the treatment of BPH, and thus that the disclosure the Post Office had agreed to was inaccurate, *Metabolic* was alone enough to justify reopening the case and reviewing for accuracy any advertising involving Urex or the Urex formula. In addition, the 1970 amendments that eliminated the requirement of fraud from the showing necessary for the Postal Service in a stop order proceeding resulted in a new statute for purposes of the settlement. Of course, the amendments could also qualify as changed circumstance, since there is no way of knowing whether the Post Office would have accepted the offered disclosure if its burden then had been to show that such a claim was merely false, and not also fraudulent.[11]

Nor is the 1962 *Metabolic* decision an obstacle to those proceedings. In *Metabolic* the Food and Drug Administration sought to enjoin use, in the labeling of the product, of the claim that it was effective in the treatment of BPH. The court granted the injunction, finding that as labeled the product was misbranded in violation of 21 U.S.C. § 352. While all that was necessary to support the injunction was a finding that the labeling before the court was "false or misleading in any particular," *id.* § 352(a), the court observed that "many doctors" had observed symptomatic relief and suggested that such relief could "possibly" be claimed by the defendants. The court declined, however, in framing and later modifying its injunction, to approve a labeling claim of symptomatic relief such as that which Prostex now bears; the veracity of such a claim, the court ruled, was for the FDA to decide in the first instance.

Far from precluding further administrative review of the question of the product's effect on BPH symptoms, the *Metabolic* decision appears to invite it. Nothing in the decision prevents the FDA from claiming that as it is now labeled Prostex is misbranded. It follows that nothing prevents the Postal Service from claiming that as it is now advertised Prostex is falsely represented for purposes of § 3005, especially where the advertising goes beyond the label in its claims for the drug. The most that Dr. Kurzon can say of *Metabolic* is that it established that in 1962 many doctors believed that Prostex gave symptomatic relief to BPH; and even to this extent the decision is not conclusive.

*Affirmed.*

---

11. *See U. S. Health Club, Inc. v. Major,* 292 F.2d 665 (3d Cir.), *cert. denied,* 368 U.S. 896, 82 S.Ct. 172, 7 L.Ed.2d 92 (1961).

"Whether the claims made are false is usually a matter more susceptible of proof than establishing intent to deceive. . . ." *Id.* at 667; *see Reilly v. Pinkus,* 338 U.S. 269, 276, 70 S.Ct. 110, 94 L.Ed. 63 (1949).