**GRAND ISLANDER HEALTH CARE CENTER, INC., Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, and The Travelers Insurance Company, Defendants.**

**Civ. A. No. 82–0304–S.**

United States District Court,
D. Rhode Island.

Oct. 17, 1983.

Higgins, Cavanagh & Cooney by Guido R. Salvadore, Gerald C. DeMaria, Robert G. Jeffrey, Providence, R.I., for plaintiff.

Clifford Pierce, Asst. Regional Counsel, Dept. of Health & Human Services, Boston, Mass., Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Robert L. Gammell, Asst. U.S. Attys., Providence, R.I., for defendants.

## OPINION

SELYA, District Judge.

This is an action brought by Grand Islander Health Care Center, Inc. ("Grand Islander") pursuant to 42 U.S.C. § 1395*oo* (f)(1). Plaintiff appeals from a decision rendered by the Provider Reimbursement Review Board (the "Board" or "PRRB") in which the Board affirmed the denial of various of Grand Islander's claims for reimbursement under the Medicare program, 42 U.S.C. § 1395 *et seq.* (the "Act").[1] The Act is a federal insurance scheme which allows for the reimbursement of "reasonable costs" to those who provide health-care services to Medicare-eligible individuals, 42 U.S.C. § 1395f(b), and which places on the Secretary of Health and Human Services the responsibility for determining the amount of such payments. 42 U.S.C. § 1395g. Under 42 U.S.C. § 1395h, the Secretary is authorized to contract with public or private entities as fiscal intermediaries to assist with the disbursement of Medicare funds.

In the present case, Grand Islander, the owner of a skilled nursing intermediate care facility in Middletown, Rhode Island, disputes a denial originally issued by the Travelers Insurance Company ("Travelers"), a duly appointed fiscal intermediary, and subsequently affirmed by the Board following a plenary evidentiary hearing. The denial relates to reimbursement for various items contained in the plaintiff's cost reports for the years ended December 31, 1975 and December 31, 1976.

The matter is before the court on cross-motions for summary judgment, each based upon the administrative record. Per scrutation of the issues raised in this appeal requires, at the outset, an explication of the factual setting giving rise to the litigation.

### I.

Grand Islander is a wholly-owned subsidiary of Great American Nursing Centers, Inc. ("Great American"). It operates a 134-bed nursing home[2] in Middletown.

---

1. The PRRB is an integral part of the dedalian administrative review mechanism postulated by the Act. The make-up of the Board is constituted pursuant to 42 U.S.C. § 1395*oo* (h). All PRRB decisions comprise final agency action unless set aside by the Secretary within sixty days of date of decision. 42 U.S.C. § 1395*oo* (f)(1). In the case at bar, the Secretary permitted the Board's findings to stand.

2. While the facility has been licensed for 148 beds by the State of Rhode Island, the provider's cost reports and other filings, *see, e.g.,* the series of Budget Bureau Form No. 72–R0799 ("Extended Care Facility—Statistical and Other Data") submissions, plainly indicate that the case was heard and decided on the basis of a 134-bed facility, in which 32 beds were Medicare-certified. The instant appeal does not challenge that hypothesis. Accordingly, the court will utilize the same figures.

Thirty-two of these beds are certified for Medicare participation as a distinct-part skilled nursing facility. Grand Islander leases its building and equipment from First Equity Capital Corporation ("First Equity"), another wholly-owned subsidiary of Great American.

In approximately August of 1969, Great American purchased the tract of land on which the nursing home is presently situated. In February, 1970 it conveyed the real estate to First Equity. Soon thereafter, First Equity entered into a construction contract with Medical Building Developers, Inc. ("MBD"), a Rhode Island corporation of which Andrew Panteleakis was the sole shareholder.[3] The ubiquitous Mr. Panteleakis was also an officer, director, and a 35% interest-holder of Great American. Prior to entering into the contract with MBD, First Equity had received a computerized cost analysis for the construction of the facility from Bowerman Brothers, Inc. ("Bowerman"), an independent design and construction company. The Bowerman breakdown projected anticipated construction costs of $2,115,781.00. At the hearing before the PRRB, there was evidence that First Equity also received an oral price quotation from one Carlone. Yet, First Equity never advertised for bids in any manner, nor did it receive so much as one formal written bid proposal from any individual or entity before entering into the MBD contract.

Since 1961, Panteleakis has been engaged in numerous construction ventures in Massachusetts, Connecticut, and Rhode Island, invariably through corporate alter egos specially organized for that end in each of these three states. He formed MBD in 1972 for the stated purpose of developing and constructing medical buildings. · MBD actually built three such facilities (of which the Grand Islander was the second). Norwich Medical Arts Building in Norwich, Connecticut, MBD's first project, was begun in 1972 and was completed in 1973 (at about the time that ground was broken for the Grand Islander facility). Work on the third project undertaken by MBD (the construction of the Groton Regency Nursing Home) was commenced after Grand Islander was built.

During the period when Grand Islander was under construction, MBD rented space from American Capital, Inc. ("American"), in "Miramar", a stately fifty-room mansion located in Newport, Rhode Island. Not surprisingly, American was owned entirely by Panteleakis. In addition to MBD, Medical Building Designers ("M-Des"), an engineering firm of which Panteleakis was also the sole shareholder, enjoyed the use of office space in these posh surroundings.[4] This was not the only thing which the two Miramar tenants had in common: during the relevant time period, M-Des did work for the Norwich Medical Arts Building.

Financing for the Grand Islander facility was acquired through the Old Stone Bank, Providence, Rhode Island. First Equity took a 25-year mortgage loan in the principal amount of $1,700,000.00 at an interest rate of 9¼ percent in order to finance construction costs. It also borrowed $300,-000.00 at the bank's then standard variable rate to assist in the purchase of furnishings, fixtures, and equipment.

Grand Islander admitted the first patient to its non-Medicare wing on November 26, 1974. Its distinct wing was Medicare-certified on February 15, 1975 and admitted its first patient a few days later. At that time (February 21, 1975), the non-distinct wing had a 34% occupancy rate.

In this action, plaintiff disputes the following conclusions and findings of the Board:

---

3. The original contract price was $1,710,000.00. The parties subsequently negotiated several changes in the construction plans. In its final form, the contract called for the payment of $1,776,500.00 to MBD.

4. The government contends that Newport Medical Developers, Inc., yet another Panteleakis enterprise, also occupied space at Miramar. But, the uncontradicted testimony was to the effect that Newport Medical Developers, Inc. was inactive during the time span in question.

(1) Grand Islander does not qualify under the exception to the related organization principle;[5] and, therefore, its reimbursable construction costs should be based on the costs actually incurred by MBD, rather than on the costs paid by First Equity.

(2) Allowable overhead costs should be limited to those verified by an independent audit conducted by the State of Rhode Island.

(3) The compensable interest expense on the loans allegedly taken to finance the construction should be computed on the basis of the costs incurred by MBD, minus the owner's investment in the project.[6]

(4) Grand Islander failed adequately to document certain equipment purchases, and consequently, the interest expense in-

curred in relation to such acquisitions was not allowable.

(5) The calculation of the occupancy differential between the certified and non-certified portions of a facility necessary to determine standby cost allocation[7] should be based on a comparison of occupancy rates of the two sections during the cost reporting year.

(6) Grand Islander failed adequately to substantiate its claim for the reimbursement of compensation allegedly paid to Panteleakis as co-administrator of the nursing facility.[8]

The plaintiff contends that in so holding, the Board acted in a manner which was unlawful, arbitrary, capricious, and characterized by abuse of discretion. Grand Islander further contends that the Board's decision is unsupported by substantial evi-

5. 42 C.F.R. § 405.427 provides that "[c]osts applicable to services, facilities and supplies furnished to the provider by organizations related to the provider ... are includable in the allowable cost of the provider at the *cost to the related organization.*" (emphasis added). Section 405.-427(d) delineates an exception to this rule pursuant to which a provider can claim its own costs as an expense. § 405.427(d) states that in order to qualify for this exception, the provider must show by convincing evidence substantially that:

(1) the supplying organization is a bona fide separate organization;
(2) a substantial part of its business activity of the type carried on with the provider is transacted with others than the provider and organizations related to the supplier;
(3) there is an open, competitive market for the type of services, facilities, or supplies furnished by the organization;
(4) the services, facilities, or supplies are those which commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions.

Plaintiff raises two distinct claims with regard to the Board's application of § 405.427. First, it contends that the Board misapplied § 405.427 to the facts of the present case in finding that Grand Islander did not meet the requirements of the exception contained in § 405.427(d). Secondly, it challenges the Board's application of § 405.427 insofar as it did not allow for an independent evaluation of whether the transaction between the related parties in this case was reasonable. Although the plaintiff couches this

argument as a challenge to the manner in which the agency applied § 405.427, Grand Islander is actually challenging the validity of the regulation itself.

6. In contesting this finding, plaintiff disputes the applicability of the related-party principle to the interest on a loan allegedly taken to finance the building of the nursing home.

7. Under the Medicare reimbursement scheme, standby costs for unoccupied beds (e.g., depreciation, operation of plant, etc.) are generally allocated between Medicare-certified and non-certified units on a square footage basis. In order to eliminate potential inequitable results which are inherent in a simple, area-based allocation method, § 2342 of the *Provider Reimbursement Manual* ("Manual") provides that where the occupancy rate of certified and non-certified portions of a provider differ by 25% or more, standby costs will be allocated to the two parts under a usage formula, rather than by the means of the square footage method. *Beverly Enterprises v. Califano,* 446 F.Supp. 599, 605–06 (D.D.C.1978). Plaintiff asserts that the Board incorrectly manipulated time periods in computing whether a 25% differential existed between the certified and non-certified wings of Grand Islander.

8. In its brief, plaintiff also claims that it is entitled to reimbursement for legal fees paid to Higgins, Cavanagh & Cooney in the amount of $7,900.00. This claim was not presented to the Board and thus is not a proper subject for review. *See Getty Oil Co. v. Andrus,* 607 F.2d 253, 256 (9th Cir.1979).

dence and unwarranted by the facts. To frost the cake, it adds allegations of unconstitutionality. The plaintiff prays relief in the form of an order reversing the PRRB's decision and insuring that Grand Islander be reimbursed in full for the disputed costs.

For each in reference, these claims will be addressed below severally (albeit not in the exact order in which they have been advanced by Grand Islander).

## II.

In order to address Grand Islander's claims, the appropriate standard of review must first be delineated. Plaintiff has properly invoked the jurisdiction of this court pursuant to 42 U.S.C. § 1395oo (f)(1). The scope of the available judicial review is, however, extremely narrow. 42 U.S.C. § 1395oo (f)(1) provides that appeals from the Secretary's decisions shall be tried pursuant to the applicable provisions of the Administrative Procedure Act. Under that standard, a court may overturn an agency's action only if it is found to be:

(a) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(b) contrary to constitutional right, power, privilege or immunity;

(c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(d) without observance of procedure required by law; or

(e) unsupported by substantial evidence.

5 U.S.C. § 706; *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 689 F.2d 1112, 1117 (1st Cir. 1982); *American Medical International, Inc. v. Secretary of Health, Education and Welfare,* 466 F.Supp. 605, 610 (D.D.C. 1979), *aff'd,* 677 F.2d 118 (D.C.Cir.1981).

Furthermore, several of the claims posited by the plaintiff constitute challenges to the Board's interpretation of its own regulations. The First Circuit has put a gloss on the Administrative Procedure Act in regard to such claims:

> Generally, such an interpretation is of controlling weight, unless the reviewing court determines that it is plainly erroneous or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Deference is particularly appropriate in an area that is as complex as the field of Medicare reimbursement. . . .

*Cheshire Hospital,* 689 F.2d at 1117. *See also Hospital San Jorge v. Secretary of Health, Education & Welfare,* 616 F.2d 580, 589 (1st Cir.1980) (Campbell, J., concurring).

Plaintiff also challenges the promulgation of C.F.R. § 405.427 as an invalid exercise of the Secretary's rule-making authority on statutory and constitutional grounds. With respect to this contention the court must determine whether the regulation is consistent with the purposes of the Act, *American Hospital Management Corp. v. Harris,* 638 F.2d 1208, 1212 (9th Cir.1981), and whether the regulation is rationally related to a legitimate governmental objective. *Fairfax Hospital Association, v. Califano,* 585 F.2d 602, 610 (4th Cir.1978).

## III.

Plaintiff asseverates that the Board erred in its application of the related party principle and consequently, in trimming the allowable costs claimed by Grand Islander for the construction of the nursing home. This reduction was a result of the substitution of the costs incurred by MBD, the "related party," for the expenses incurred by First Equity. The Board's application of the related party principle to this item was based on its findings that First Equity and MBD were related parties;[9] and that

---

**9.** Under Section 405.427(b) the phrase "related to the provider" means that "the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organi-

plaintiff failed to demonstrate by convincing evidence that it met two of the four requirements of the exception enumerated in § 405.427(d), namely that MBD had substantial business with unrelated parties, and that an "open competitive market" existed for the building of the nursing home. Plaintiff's assault upon the Board's application of the related party principle is double-barrelled. It argues, first, that the PRRB's finding that Grand Islander did not qualify under the § 405.427(d) exception is so contrary to the facts as developed in the record as to represent an abuse of discretion. Such abuse, plaintiff contends, inheres in the Board's failure to consider a number of critical facts (such as the Bowerman breakdown), in its overly stringent interpretation of the exception, and in its erroneous reliance on § 1008 of the Manual.[10] Specifically, plaintiff argues that in determining whether a substantial part of MBD's business activity was carried on with unrelated parties, the Board erred in declining to consider the work histories of other corporations controlled by Panteleakis. Plaintiff, moreover, challenges the accuracy of the Board's characterization of MBD's efforts. Second, plaintiff urges that the application of the related party principle according to its terms is contrary to the substantive mandates of the Act and, moreover, violates plaintiff's due process rights.

The Board's conclusion that Grand Islander did not meet the requirements of § 405.427(d) appears to be supported by substantial evidence. First, in determining whether a meaningful part of MBD's business was conducted with non-related parties, PRRB's decision to consider only the history of MBD embodies an interpretation of § 405.427(d) which is not "plainly erroneous" or "inconsistent" with the regulation. *See Cheshire Hospital,* 689 F.2d at 1117. The regulation palpably speaks to the security and fiscal integrity inherent in dealing at arms' length with an independent contractor with a demonstrable track record. Panteleakis, by his creation of a string of sister corporations, has woven the very web in which the plaintiff is now ensnared: a corporation cannot stand separate and apart only when that status suits its principal's convenience. And, just as the fragmentation of business interests among a plethora of corporate shells limits the principal's liability and protects his assets, it equally deprives the contracting party of the assurances and stability at which the regulation is aimed.

When one views the business activity of MBD only, the Board's finding that Grand Islander failed to satisfy this criterion[11] was supported by the requisite evidence. MBD engaged in a total of three construction projects.[12] At the time it contracted to build the Grand Islander nursing home, it had only erected one other facility for a

zation furnishing the services, facilities, or supplies." Plaintiff concedes that First Equity is "related" to MBD.

**10.** Manual § 1008 (HIM–15) provides that where a facility is purchased from a related organization, the exception to the related party principle does not apply since "the sale of such facilities would not meet the requirement that there be an open competitive market..." Plaintiff's argument with respect to § 1008 is twofold: (i) § 1008 is meant to apply to the purchase of an ongoing facility, and therefore should not have been applied to the transaction between MBD and First Equity, and (ii) insofar as this section effectively eliminates the exception to the related party principle with respect to a certain type of transaction, it is contrary to the mandates of the Secretary and is, therefore, invalid.

**11.** Manual § 1010 has interpreted this requirement to "cover situations where goods and service are supplied to the general public and only incidentally are furnished to related organizations." *American Medical International, Inc. v. Secretary of Health, Education and Welfare,* 466 F.Supp. at 618–19.

**12.** Plaintiff correctly notes that the Board erred in finding that MBD was organized for the sole purpose of constructing the Grand Islander facility. Yet, such an error, without more, does not mandate reversal of the finding where substantial other evidence supports the administrative conclusion. *See Kurzon v. United States Postal Service,* 539 F.2d 788, 796 (1st Cir.1976).

non-related party. While it is clear that this court must carefully review the Board's findings, the fact that it might have come to the opposite result is not grounds for reversal. *American Hospital Management Corp. v. Harris*, 638 F.2d 1208, 1211 (9th Cir.1981). As in *American Medical International, Inc. v. Secretary of Health, Education and Welfare*, *supra* (where the supplier's revenues from non-related parties were 52 percent, 64 percent and 67 percent, respectively, for the three years at issue, *id.* at 619), the plaintiff has failed to establish a basis for overturning the Board's conclusion.

And, while this holding is, in and of itself, dispositive of the plaintiff's § 405.-427(d) claim, the court also notes that PRRB's finding that Grand Islander failed to show that there was an "open and competitive" market for the type of services furnished by MBD is, on this record, equally impugnable. As an initial matter, there is absolutely no showing that the Board relied on Manual § 1008 in concluding that Grand Islander failed to satisfy this criterion; thus, plaintiff's imprecations that this section is inapplicable to the facts of the present case and that § 1008 is an invalid interpretation of § 405.427(d) vanish into thin air. Plaintiff's claim that there is a dearth of evidence to support the Board's factual finding is also without merit. As the district court noted in *American Medical International, Inc.*, 466 F.Supp. at 619:

> The purpose of this [criterion] is that if an open, competitive market exists—and a related provider is in a position to and did compare bids—this is evidence that the related supplier does not exist merely to serve the related provider.

Here plaintiff came forward with no proof that it had solicited bids by any method other than through casual inquiry and word-of-mouth. Moreover, although First Equity obtained a computerized cost breakdown from Bowerman, it did not at any time request or receive a formal bid from that company, nor indeed, from any other entity or individual. Even the Bowerman analysis did not relate to the actual construction undertaken, as the plans were changed several times after the Bowerman figures were presented. The plaintiff did not offer any evidence, apart from the conclusory and self-serving statements of First Equity's president, demonstrating that the customary market forces of the free enterprise system were at work when First Equity contracted with MBD. Based on the administrative record, the Board was amply justified in finding that First Equity, in letting the subject contract, neither was in a position to, nor did, compare bid proposals so as to insure competitive pricing. This was an "inside" deal—and was properly treated as such by the Board.

■ This is, however, by no means dispositive of the construction cost issue, given the posture of this case—for plaintiff challenges the validity of § 405.427 itself. At bottom, Grand Islander argues that the regulation is not reasonably related to the purposes of the Act.[13] In amplification of this position, the plaintiff reasons that the regulation's failure to allow for an independent assessment of the reasonableness of transactions between related parties conflicts with the legislation's twin mandates that (i) all actual and reasonable costs be

---

13. 42 U.S.C. § 1395x(v)(1)(A) provides in relevant part:

(v)(1)(A) Reasonable Costs. The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services ... such regulations shall ... take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance program established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered...

reimbursed, and (ii) costs incurred in the delivery of services to Medicare-eligible individuals not be shifted to non-Medicare patients. Grand Islander leans heavily in this respect on the decisions in *South Boston General Hospital v. Blue Cross of Virginia*, 409 F.Supp. 1380 (W.D.Vir.1976) and *Northwest Community Hospital, Inc. v. Califano*, 442 F.Supp. 949 (S.D.Iowa 1977).

Such reliance is, however, misplaced. Both of these cases are inapposite. See *American Hospital Management Corp. v. Harris*, 638 F.2d at 1213 n. 9. In *South Boston*, the district court ruled on the validity of 42 C.F.R. §§ 405.415 and 405.419 after holding that § 405.427 was inapplicable to the facts before it. 409 F.Supp. at 1384. Similarly, the court in *Northwest Community Hospital* held that § 405.427 was inapplicable in that action because there was no prior relationship between the parties, as the linkage between the provider and the supplier of services arose solely as a result of the management contract which was there at issue. 442 F.Supp. at 951–52. Neither of these cases are controlling (nor even particularly enlightening) as to the *validity* of § 405.427. Moreover, as the Ninth Circuit has noted, the *South Boston* court cited no caselaw in support of its dictum that an independent evaluation of the fairness of transactions between related parties is required by the enabling legislation. *See American Hospital Management Corp. v. Harris*, 638 F.2d at 1213 n. 9.

As Grand Islander has conceded, this court's review of the exercise of rulemaking authority under § 1395x(v)(1)(A) is limited to "determining whether the regulation is reasonably related to the purpose of the relevant enabling legislation, as well as to the more particular purpose through which the regulation implements those objectives in a particular area." *American Hospital Management Corp.*, 638 F.2d at 1212. *See also Mourning v. Family Publications Services, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973); *Cheshire Hospital*, 689 F.2d at 1118. Contrary to plaintiff's suggestion, § 405.427

does not conflict with the Secretary's obligation to provide reimbursement for actual and reasonable expenses. *American Hospital Management Corp.*, 638 F.2d at 1212; *Fairfax Hospital Association v. Califano*, 585 F.2d at 607–8; *Schroeder Nursing Care, Inc. v. Mutual of Omaha Insurance Company*, 311 F.Supp. 405, 410 (E.D.Wisc.1970). It is not "demonstrably irrational". *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 796, 63 L.Ed.2d 22 (1980). Rather, the regulation is a prophylactic rule aimed at preventing artificial inflation of the price of services and/or goods where an unnaturally cozy relationship exists between provider and supplier, *Goleta Valley Community Hospital v. Schweiker*, 647 F.2d 894, 897 (9th Cir.1981); *Fairfax Hospital Association*, 585 F.2d at 607, in order to prevent reimbursement for costs not "actually" or reasonably expended. While this regulation admittedly paints with a broad stroke, such brushwork, without more, is not grounds for invalidation. *American Hospital Management Corp.*, 638 F.2d at 1212; *Fairfax Hospital Association*, 585 F.2d at 606. Within the sometimes wide range of permissible regulatory action, it is for the agency—not the courts—to make discretionary decisions as to how best to effectuate statutory goals. *See Faulkner Hospital Corp. v. Schweiker*, 702 F.2d 22, 25 (1st Cir.1983); *Gosman v. United States*, 573 F.2d 31, 41, 215 Ct.Cl. 617, 627 (1978). "[J]udges are not selected nor are they trained as administrators, and the judicial process is not structured as an organ of governance". *Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority*, 718 F.2d 490 at 498 (1st Cir.1983). It is for the executive agencies to make such policy assessments, subject to judicial review not of the *wisdom* of the policies so enunciated but of their *legality* only.

Plaintiff's blunderbuss contention, unaccompanied by citation of authority, to the effect that the application of § 405.427 abridges plaintiff's due process rights under the Fifth Amendment is equally unper-

414

suasive. It is deserving of summary rejection. *See Fairfax Hospital Association v. Califano*, 585 F.2d at 610.

For the reasons stated above, the court holds that Grand Islander's multi-faceted challenge to the PRRB's resolution of the § 405.427 issues at bar is unavailing on all fronts, and that the decision of the PRRB in this respect must be sustained.

## IV.

Plaintiff next argues that the Board acted arbitrarily and capriciously in ruling that the only overhead expenses of MBD which could be included in calculating the historical costs of building the Grand Islander facility were those verified by an independent audit conducted under the auspices of the state of Rhode Island. Travelers originally denied Grand Islander's claim for reimbursement of $209,000.00 in overhead expenses arising from the use of the Miramar offices on the ground that such claim was not supported by adequate documentation. Specifically, the intermediary ruled that Grand Islander had not supplied information indicating what portion of Miramar was, in fact, used by MBD. The Board, without discussing whether or not Grand Islander's claim was supported by adequate documentation, focused exclusively on an audit of these expenses which had been undertaken by a Rhode Island state agency, and summarily concluded that "the state audit is an independent audit and, therefore, the provider is entitled to the costs verified by the State of Rhode Island's audit." *Grand Islander Health Care Center, Inc. v. Travelers Insurance Co.*, [New Developments] Medicare & Medicaid Guide (CCH) ¶ 31, 872 at 9322 (1982). Significantly, other than the above-quoted reference to the "independent" nature of the state audit, the PRRB never deigned in any way to examine the reasonableness either of that audit or of its underlying methodology.

■ The record reflects that, although Grand Islander could not verify which overhead expenses were directly attributable to specific projects of MBD, the plaintiff did present the Board with analyses of its overhead expenses allocated to the Grand Islander project and the Norwich Medical Arts project (which analyses apportioned the expenses in question on the basis of the revenue earned by MBD on each of the two ventures), along with the affidavit of a certified public accountant attesting to the propriety of such an allocation method. PRRB's failure to evaluate the adequacy of the plaintiff's proffer,[14] its silent declination to review the state of the evidence generally, and its perfunctory acceptance of the Rhode Island audit combine to represent an abuse of the Board's discretion.

It is the Secretary who, under the Act, has the obligation of overseeing reimbursement for actual, reasonable costs. That obligation cuts two ways: it assures the government of a dollar's worth of value for a dollar spent; and it assures the prudent provider of reimbursement if and as reimbursement is due. There is scant warrant under either the Act or the regulations for the Secretary mindlessly to delegate this responsibility to a state agency, or to accept a pig in an unexamined state poke in lieu of fulfilling the incumbent fact-finding function. That sort of blind-man's buff does violence to settled notions of administrative decision-making, *cf. Arlington Hospital v. Schweiker*, 547 F.Supp. 670, 679–80 (E.D.Va.1982) (court remanded for a determination of reimbursable physician billing costs after finding that the agency's accounting method was not based on the available cost information but instead, reflected a wholly arbitrary judgment), and cannot be allowed to stand.

■ This ruling, however, does not mean that Grand Islander wins the point by de-

---

14. While it is true that the basis for an administrative finding need not be expressed with ideal clarity, *Kurzon v. United States*, 539 F.2d at 793, there is absolutely nothing to indicate that the Board made any independent evaluation of the merits of Grand Islander's contention as to this issue. When an agency resorts to errant ostrichism, there is no balm which the court can, in conscience, apply to resuscitate the resultant finding.

fault, or that its submissions should perforce be credited by this court. Determining the appropriate amount of reimbursement is a factual matter which, to the contrary, ought not to be judicially determined *de novo*. *Faulkner Hospital Corp. v. Schweiker*, 537 F.Supp. 1058, 1071 (D.Mass.), *aff'd*, 702 F.2d 22 (1st Cir.1983); *cf. Arlington Hospital v. Schweiker, supra*. The court will therefore remand this issue to the Board for an express finding regarding the amount of allowable overhead costs based upon due evaluation of the data before it.

## V.

Plaintiff claims that it is entitled to reimbursement in the amount of $19,603.90 referable to remuneration paid to Panteleakis during 1975 for his services as the home's co-administrator. Under 42 C.F.R. § 405.426, reasonable compensation paid to an owner is an allowable expense provided that "the services are actually performed in a necessary function." Like any other purported expense, however, such a claim must be supported by adequate documentation. *See* 42 U.S.C. § 1395g; 42 C.F.R. §§ 405.403 and 405.406.

■ Travelers determined that Grand Islander's claim for reimbursement was not so supported, and the Board affirmed the intermediary's finding. Here, too, the court's review is limited to determining whether the Board's finding is supported by substantial evidence. *Cheshire Hospital*, 689 F.2d at 1117. In this view, " 'substantial evidence' means something less than the weight of the evidence." *Faulkner Hospital Corp. v. Schweiker*, 537 F.Supp. at 1063. Contrary to plaintiff's assertions, the Board's finding does not fall short of this standard. The record establishes that: (i) the plaintiff came forward with no written records documenting the time Panteleakis supposedly spent in his claimed capacity as co-administrator of the facility; (ii) the only tangible evidence of Panteleakis' service in such capacity was a document submitted in support of Grand Islander's application for state licensure; and (iii) Panteleakis was never on the payroll of MBD, but instead, was paid by yet another corporate entity, viz., Great American Management Company. Given the unremitting indications in the record that Panteleakis wore many hats, coupled with the paucity of any cogent proof that the co-administrator's cap was a meaningful part of his millinery adornment, the Board's conclusion on this point is wholly understandable. It is not enough that a title, no matter how impressive, was conferred. In the absence of satisfactory proof that Panteleakis actually rendered necessary services to the provider within the strictures of the Medicare format, the PRRB's decision should not be disturbed.

## VI.

■ Plaintiff's penultimate thrust raises a challenge to the method employed by the Board in determining standby costs. As the court noted earlier, *see* n. 7, *ante*, Manual § 2342 provides in substance that where the occupancy rates of certified and non-certified portions of a facility differ by 25 percent or more, standby costs are allocated to the two sections on the basis of a usage formula instead of on a simple square-footage comparison. In determining whether such a differential existed during the relevant time period, the Board, relying on Manual § 2342.1,[15] compared the occupancy rates of Grand Islander's certified and non-certified wings during the time period beginning February 21, 1975 and ending December 31, 1975 (the cost reporting period for the certified part being the calendar year, and the initial date of

---

**15.** Section 2342.1 provides in relevant part:

2342.1 *General Rule*—Where the average occupancy rate of a certified portion of an institution is substantially less than the average occupancy rate in the non-certified portion, the routine costs attributable to the unoccupied beds of the institution allocated on the basis of space ... are reallocated using the following basis...

A. *Substantial difference in Occupancy Rates*—For this purpose, a difference of 25 percentage points or more in any Medicare cost reporting period is considered substantial....

occupancy of that wing being February 21). Grand Islander contends that the Board erroneously computed the occupancy differential insofar as it neglected to consider the fact that the two sections opened on different dates. It illustrates the argument by noting that, on February 21, the non-distinct wing, having had a running start, enjoyed 34 percent occupancy. The plaintiff characterizes the PRRB's approach as one which was inherently unfair, contending that the methodology should have taken the predictable start-up lag in utilization of *both* portions of the facility equally into account. Plaintiff suggests, in effect, that the Board should have compared the distinct wing's occupancy rate during its Medicare cost reporting period with the occupancy rate of the non-certified part for its first ten and one-half months of that part's operation (November 26, 1974 through October 5, 1975).

Inasmuch as this is, when stripped to its essentials, a challenge to the agency's interpretation of its own rule, the court must be guided by the First Circuit's admonition that, particularly in a complex and highly technical area such as Medicare reimbursement, "[m]atters of accounting, unless they 'be the expression of a whim rather than an exercise of judgment,' are for the agency." *Cheshire Hospital*, 689 F.2d at 1117 (quoting *Hospital San Jorge v. Secretary of Health, Education & Welfare*, 616 F.2d at 589). *See also, Catholic Medical Center v. New Hampshire-Vermont Hospitalization Service, Inc.*, 707 F.2d 7, 11 (1st Cir.1983); *Faulkner Hospital Corp. v. Schweiker*, 702 F.2d at 25.

The court acknowledges that the Board's formulation may, at times, lead to an imperfect result. But, the test is one of rationality, not of the attainment of some theoretical nirvana. The PRRB's accounting method certainly is not a flight of fancy. And, "the agency has expertise in the substantive area involved." *North Clackamus Community Hospital v. Harris*, 664 F.2d 701, 704 (9th Cir.1980). Manual

§ 2342 is, by its terms, designed to generate an accounting for the provider's cost reporting period. Indeed, the entire Medicare reimbursement scheme pivots upon such a standardized approach. *See* 42 C.F.R. § 405.406(b).[16] To mix and match data from different cost reporting periods would not only do violence to the sound accounting principles upon which Medicare is based, but would create an unmanageable administrative and bookkeeping nightmare. Whenever a regulation draws sharp lines, some inequity may arguably occur as to those who fall close to the cut-off point; but, courts have long recognized that this is a modest—and entirely warranted—price to pay in exchange for bringing a semblance of orderliness and regularity to the administrative process. *See, e.g., Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *Beverly Enterprises v. Califano*, 446 F.Supp. at 606. Moreover, the court is confident that if the coin were flipped and Grand Islander had inaugurated its distinct wing prior to the opening of its non-Medicare wing, the plaintiff would be in the vanguard of those advocating the rationality of Manual § 2342.1(a), as applied here. The PRRB's determination is neither clearly erroneous nor inimical to the regulations; it merits affirmance.

## VII.

The final contention advanced by Grand Islander relates to the Board's treatment of claimed interest expense for 1975 and 1976. The Board excluded a total of $94,966.00 from Grand Islander's reimbursable interest expense, as claimed in its cost reports, based upon the following findings: (i) that the plaintiff had failed to document the purchase of certain equipment, and consequently, the interest expense attributable to those purchases should be disallowed; and (ii) that the allowable interest expense should be computed on the basis of the actual historical cost of the building (*i.e.*,

---

**16.** 42 C.F.R. § 405.406(b) provides: "Cost reports will be required from providers on an annual basis with reporting periods based on the provider's accounting year..."

the costs in fact incurred by MBD, *see* Part III, *ante* ), less the owner's investment.

■ There can be little doubt but that the Board's disallowance of $33,000.00 in interest expense because of Grand Islander's failure to provide adequate documentation of certain purchases was justified, especially in light of the admission by an officer of First Equity that the assets at issue were not on the plaintiff's books for Medicare purposes.

■ Plaintiff's remaining claim cannot be dismissed as easily. Grand Islander contends that the PRRB erroneously relied on 42 C.F.R. §§ 405.427 and 405.419(d)(i)(A) and Manual § 203(A) in reducing the reimbursable interest expense on the construction loan which was taken by First Equity to finance the building of the nursing home. Section 405.419 provides in relevant part:

(a) *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost...

(b) Definitions—...

(2) *Necessary.* Necessary requires that the interest

(i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investment would not be considered necessary.

(ii) Be incurred on a loan made for a purpose reasonably related to patient care....

(d) *Loans not reasonably related to patient care.*

(1) The following types of loans are not considered to be for a purpose reasonably related to patient care:

(i) For loans made to finance acquisition of a facility, that portion of the cost that exceeds:

(A) Historical cost as determined under 405.415(b)...

(2) In determining whether a loan was made for the purpose of acquiring a facility, we will apply any owner's investment or funds first to the tangible assets, then

to the intangible assets. Other than goodwill and lastly to the goodwill...

Section 405.415(b) provides in pertinent part:

(1) *Historical Costs.* Historical cost is the cost incurred by the owner in acquiring the asset.

Provider Reimbursement Manual § 203 provides in relevant part:

(A) Where a loan is obtained to finance the purchase of a facility ... and the purchase price exceeds the historical cost ... interest expense on that portion of the loan used to finance the excess is not considered reasonably related to patient care and is not allowable.

Grand Islander launches a five-gun salvo in support of this attack. The plaintiff argues, first, that 42 C.F.R. § 405.419(d) and Manual § 203(A) do not apply to the transaction at issue, since these provisions relate only to loans made to finance ongoing facilities; and secondly, that even if these provisions are applicable, the full interest expense should nevertheless be allowable, inasmuch as "historical cost" is defined as the "cost incurred by the present owner." 42 C.F.R. § 405.415(b). Third, plaintiff points out that § 405.427 does not by its terms apply to the recovery of interest expense. As a fourth sally, the plaintiff asseverates that there is no regulation which specifically disallows interest expense paid to an independent lender (notwithstanding that the underlying transaction was between related parties). Lastly, lest any avenue be left untraversed, plaintiff argues that the disallowance of any portion of plaintiff's interest expense claim would contravene a veritable potpourri of the Act's provisions and the regulations promulgated thereunder, *see, e.g.*, 42 U.S.C. § 1395f(b) (providers shall be reimbursed for their "reasonable costs"); 42 U.S.C. § 1395x(v)(1)(A) ("costs actually incurred" are recoverable). Since these arguments, in the main, implicate the Board's interpretation of the Secretary's regulations, the court reiterates that deference must be ceded to the PRRB's view unless the agency's reading is "plainly erroneous or incon-

sistent" with the regulations at issue. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *North Clackamus Community Hospital v. Harris*, 701 F.2d at 704. On the facts of the present case, this court cannot so hold.

It is true that § 405.427 does not explicitly apply to the circumstances *sub judice*. Yet, it would be repugnant to the entire statutory and regulatory scheme to adopt Grand Islander's view. To do so would not only thwart the very purpose of § 405.427, namely, the prevention of artificial inflation of costs between a related provider and supplier, but would also substitute the supplier's cost for the provider's cost in determining the allowable construction costs, and then fail to reduce the reimbursable interest costs incurred in financing such construction accordingly. Such sophistry would stand logic on its head, in a manner reminiscent of Alice's colloquy with the Mad Hatter and the March Hare. *See* L. Carroll, *Alice's Adventures in Wonderland*, 60–70 (Delacorte Press/Seymour Lawrence 1966). As plaintiff correctly points out, 42 C.F.R. § 405.419(d)(i) and Manual § 203(A) do appear to govern interest incurred in relation to the purchase of an existing facility; § 405.415(b) does indeed refer to "the cost incurred by the present owner"; and § 405.419, the only regulation governing the reimbursement of interest expense, does not specifically address the allowability of interest costs on a loan where the underlying transaction is an unexpected one between related parties (and thereby inherently compromised). Nevertheless, these provisions cannot be unceremoniously yanked from the context of the Act and the regulations as a whole and be used to pillory the very objectives which the Act demands that the Secretary accomplish. The most that can fairly be said for Grand Islander's position is that none of these provisions, severally, are issue-determinative. And, without explicit guidance regarding the allowability of such interest costs, it was not unreasonable for the Board to read C.F.R. §§ 405.427 and 405.419 and Manual § 203(A) together; and subsequently to conclude that Grand Islander's reimbursable interest should be based on MBD's construction cost, rather than on First Equity's more extravagant contract price.[17]

Indeed, not only is this kind of extrapolation justified, but it is frequently essential in deciding questions of statutory interpretation where the legislature's clarion call is heard only in somewhat muted tones within the statutory scheme. For example, in *Doctors Hospital v. Califano*, 459 F.Supp. 201 (D.D.C.1978), the provider claimed that it was entitled to reimbursement for a loss it allegedly incurred as a result of the voluntary demolition of two of its buildings. On appeal from a decision by the PRRB denying such reimbursement, the district court affirmed the decision of the Board. In so holding, the court reasoned that although gains and losses incurred with respect to depreciable assets are normally an allowable expense under 42 C.F.R. § 405.415(f), the automatic application of that regulation would there have produced an illogical and inequitable result. *Doctors Hospital*, 459 F.Supp. at 209–10. Rather, common sense demanded that § 405.415(f) be construed *in pari materia* with the other applicable regulations and consequently, that the plaintiff's claim be denied. *Id.* Similarly, in *Sun City Community Hospital, Inc. v. United States*, 624 F.2d 997, 1003, 224 Ct.Cl. 201, 207 (1980), the court interpreted Manual §§ 134.6 and 104.-15 so as to "allow both sections to be read harmoniously with one another and [so as to] give a reasonable meaning to both."

---

**17.** Grand Islander takes sustenance from *South Boston General Hospital v. Blue Cross of Virginia, supra,* contending that the court there held § 405.427 inapplicable to interest expense under any and all circumstances. But, plaintiff overstates the breadth of the holding in *South Boston.* That case indicates merely that § 405.427 does not apply to interest on loans between related parties. *South Boston General Hospital,* 409 F.Supp. at 1384. The same is true of the other case relied on by the plaintiff for this proposition. *Rio Hondo Memorial Hospital,* [Current Developments] Medicare & Medicard Guide (CCH) ¶ 27, 508 at 10, 139 (1975). Indeed, interest on such direct related-party loans is specifically provided for under § 405.419.

What the plaintiff here urges upon the court is an absurd result—pure and simple; and the construction of statutes in "a mindless fashion ..., should not gladly be suffered by the courts in the absence of a firm congressional directive to do so." *United States v. Puerto Rico*, 721 F.2d 832 at —— (1st Cir.1983). That same principle applies with unabated force when an administrative agency acts to effectuate the congressional will. The Board's interpretative holding in respect to Grand Islander's claimed interest expense is soundly reasoned. It follows logically—perhaps inevitably—on the heels of the related party principle. It does not contravene any of the provisions of the Act, nor can it be held to be arbitrary, capricious, vagarious or tantamount to an abuse of discretion.

## VIII.

Based on the foregoing, the plaintiff's motion for summary judgment is denied except as to overhead expenses (*see* Part IV, *ante*); as to that issue, the matter is remanded to the Secretary for further proceedings consonant herewith. The defendant's motion for summary disposition is granted as to all issues other than overhead expenses.

*Settle order on notice.*