**Jose E. Muniz RAMIREZ, Plaintiff, Appellant,**

v.

**PUERTO RICO FIRE SERVICE and Office of Personnel and Its Director, Defendants, Appellees.**

No. 83–1012.

United States Court of Appeals, First Circuit.

Argued June 6, 1983.

Decided Aug. 26, 1983.

Jose M. Munoz Silva, Santurce, P.R., for plaintiff, appellant.

Gerardo Mariani, Asst. Sol. Gen., Santurce, P.R., with whom Miguel Pagan, Sol. Gen., San Juan, P.R., was on brief, for defendants, appellees.

Before COFFIN and BREYER, Circuit Judges, and SELYA,* District Judge.

SELYA, District Judge.

In September, 1978, when he was forty-three years old, Jose E. Muniz Ramirez applied to become a firefighter in the Puerto Rico Fire Service ("PRFS"). He subsequently passed a physical examination, and received qualifying grades in all of the customary tests. The appellant's aspirations proved to be short-lived, however, as the Office of Personnel of the Commonwealth of Puerto Rico notified him on October 1, 1980 that he was ineligible for employment as a fireman because of his age.[1] After the filing of timely charges with the Equal Employment Opportunity Commission, appellant received a right-to-sue letter from that agency under date of April 15, 1981.

Muniz thereupon brought the instant action in the district court. In his complaint, he alleged that he had been discriminated against solely on the basis of age in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ("ADEA").[2] He sought back pay, liquidated damages and injunctive relief in the form of retroactive reclassification and placement on the PRFS roster. The defendants moved for dismissal.[3]

■ The district court, relying on *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Parden v. Terminal R. Co.,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), dismissed the action. It held that (i) the Eleventh Amendment to the United States Constitution granted de-

---

* Of the District of Rhode Island, sitting by designation.

1. The Office of Personnel relied upon a policy limiting PRFS enrollment to candidates between the ages of 18 and 35 at the time of hiring. While appellant suggests, with some support in the record, that this policy was as much honored in the breach as in the observance, the threshold issues presented by this appeal are of such a nature that we need not reach any of the myriad factual questions as to (i) the even-handed application of the purported policy and/or (ii) whether or not such an age restriction constitutes a bona-fide occupational qualification.

2. In 1974, the ADEA was amended to cover state and local government employees by expanding the definition of "employer" to include "a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State, and any interstate agency...." Pub.L. 93–259, § 28(a)(1), (2), 88 Stat. 74, *codified at* 29 U.S.C. § 630(b). Puerto Rico is considered to be a "state" for purposes of the ADEA. 29 U.S.C. § 630(i).

3. While the motion to dismiss posited multiple theorems, the district court's decision rested squarely on Eleventh Amendment grounds. None of the other issues originally raised (*e.g.,* exhaustion of administrative remedies) has been briefed or argued in this tribunal, and we express no opinion on any of these. *Cf. United States v. Kobrosky,* 711 F.2d 449 at 454 (1st Cir.1983).

fendants immunity from suit because each of the agencies sued was an integral part of the executive branch of the government of the Commonwealth of Puerto Rico, and the individual defendant (the director of the Office of Personnel) was likewise immune since he had been named only in his official capacity[4]; and (ii) the Commonwealth had neither waived its immunity nor consented to claims for relief arising under ADEA. The instant appeal thereupon ensued. We reverse.

## I.

The Eleventh Amendment stands as a palladium of sovereign immunity. It bars federal court lawsuits by private parties insofar as they attempt to impose liabilities necessarily payable from public coffers, unless the state has consented to suit or unless the protective cloak of the amendment has been doffed by waiver or stripped away by congressional fiat. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ezratty v. Puerto Rico*, 648 F.2d 770, 776 (1st Cir.1981). Puerto Rico, despite the lack of formal statehood, enjoys the shelter of the Eleventh Amendment in all respects. *Ezratty v. Puerto Rico*, 648 F.2d at 776 n. 2. Consistent with the Eleventh Amendment, however, federal courts may, notwithstanding the absence of consent, waiver or evidence of congressional assertion of national hegemony, enjoin state officials to conform future conduct to the requirements of federal law, even though such a decree often has an effect on the public fisc. *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The distinction between permissible and impermissible relief in such cases turns on which way Lot's wife is facing: prospective redress is

allowable, retrospective redress is not. The foregoing principles ineluctably govern this case.

As previously noted, appellant sought not only back pay and liquidated damages, but also injunctive relief in the form of reclassification and placement on the PRFS roster. Such an injunction would afford a classic form of prospective remediation: if granted, the Commonwealth would be required to reclassify appellant presently, and to hire him as a firefighter in the future. This relief may indeed have some collateral impact on Puerto Rico's treasury, but the fiscal consequence would be no more than an unavoidable corollary of compliance with an order which by its terms is futuristic in nature. *Edelman v. Jordan*, 415 U.S. at 668, 94 S.Ct. at 1358. Such a forward-looking anodyne is not anathematic to the Eleventh Amendment, even in the absence of consent or waiver. The court below therefore erred in dismissing the appellant's complaint to the extent that it stated a claim for injunctive relief. *See Quern v. Jordan*, 440 U.S. at 347, 99 S.Ct. at 1148; *Milliken v. Bradley*, 433 U.S. 267, 290, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977); *Edelman v. Jordan*, 415 U.S. at 667–68, 94 S.Ct. at 1357–58.

## II.

The district court's dismissal of the remainder of the complaint, i.e., the claims for back pay and liquidated damages, presents a somewhat trickier Eleventh Amendment issue. The court below correctly noted the absence of any action by the Commonwealth tantamount in these circumstances to consent to suit or to waiver of immunity. Thus, if the Commonwealth is not shielded from a damage claim, it is because Congress, in passing the ADEA, abrogated the states' Eleventh Amendment immunity. *See Fitzpatrick v. Bitzer*, 427

---

**4.** Since the district court was clearly correct in its conclusion that the defendants in the case at bar were so interwoven into the fabric of Puerto Rican government as to share in full the Commonwealth's Eleventh Amendment immunity, *Edelman v. Jordan*, 415 U.S. at 663, 94

S.Ct. at 1355; *United Carolina Bank v. Board of Regents of Stephen F. Austin State University*, 665 F.2d 553, 557–58 (5th Cir.1982), we will, for ease in reference, deal with this case as if the Commonwealth itself were the defendant.

U.S. at 452, 96 S.Ct. at 2669. To pursue that inquiry, this court must first decide a question left open by *E.E.O.C. v. Wyoming,* —— U.S. ——, ——, 103 S.Ct. 1054, 1064, 75 L.Ed.2d 18 (1983), that is, whether Congress enacted the ADEA pursuant to its powers under section 5 of the Fourteenth Amendment. If so, such action can override the tenets of state sovereignty embodied in the Eleventh Amendment. *Fitzpatrick v. Bitzer,* 427 U.S. at 456, 96 S.Ct. at 2671.

■ The omission of any ritualistic incantation of powers by the Congress is not determinative, for there is no requirement that the statute incorporate buzz words such as "Fourteenth Amendment" or "section 5" or "equal protection". *E.E.O.C. v. Wyoming,* 103 S.Ct. at 1064 n. 18; *Fullilove v. Klutznick,* 448 U.S. 448, 476–78, 100 S.Ct. 2758, 2773–74, 65 L.Ed.2d 902 (1980). "The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." *Woods v. Miller,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948). Rather, absent an outright congressional declamation, it is the court's task to decipher whether Congress has enacted legislation pursuant to its section 5 powers. In so doing, the cryptology is largely dependent upon judicial ability to discern, given a fair reading of the statute and an impartial assessment of the circumstances of its passage, some legislative purpose or factual predicate adequate to support the exercise of that power. *E.E.O.C. v. Wyoming,* 103 S.Ct. at 1064 n. 18. Such an inquiry necessarily focuses upon whether or not the objectives of the legislation are within the scope of Congress' power under section 5 of the Fourteenth Amendment. *See Fullilove v. Klutznick,* 448 U.S. at 476–78, 100 S.Ct. at 2773–74; *E.E.O.C. v. Elrod,* 674 F.2d 601, 608 (7th Cir.1982).

■ This section 5 power is co-extensive with the broad grant of authority limned by the Necessary and Proper Clause, Art. 1, § 8, cl. 18, and formulated in the early days of the republic by Chief Justice Marshall in the landmark case of *McCulloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819). *See Katzenbach v. Morgan,* 384 U.S. 641, 650, 86 S.Ct. 1717, 1723, 16 L.Ed.2d 828 (1966). More than a century ago, the Court delineated this power in manner following:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Ex Parte Virginia,* 100 U.S. 339, 345–46, 25 L.Ed. 676 (1879).

The sweep of this mandate was reaffirmed in *Katzenbach v. Morgan,* 384 U.S. at 650, 86 S.Ct. at 1723. It is thus irrelevant whether the activities which Congress seeks to forbid by legislation are themselves unconstitutional either under the Equal Protection Clause or under other provisions of the Fourteenth Amendment, for Congress' reach under the Civil War Amendments has been enlarged in order to make these accretions fully effective. *City of Rome v. United States,* 446 U.S. 156, 179, 100 S.Ct. 1548, 1562, 64 L.Ed.2d 119 (1980); *Katzenbach v. Morgan,* 384 U.S. at 648–49, 86 S.Ct. at 1722–23; *E.E.O.C. v. County of Calumet,* 686 F.2d 1249, 1252 (7th Cir.1982). Accordingly, the Supreme Court's holding in *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), to the effect that a state mandatory retirement law did not violate the Equal Protection Clause, so heavily relied on by the appellees, is not germane in assessing whether or not Congress could prohibit similar activity through the medium of its section 5 powers. *See E.E.O.C. v. Elrod,* 674 F.2d at 608 n. 6.

ADEA first became law in 1967, but has since been the subject of substantial amendment. A decade ago, ADEA did not, by its terms, reach state employees, but in 1974 Congress perfected such an extension of ADEA coverage. Thus, we must decode the palimpsest so created. The legislative

history behind the 1974 amendment is less than abundant, as this revision was included in a much broader package of amendments to the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq. See E.E.O.C. v. County of Calumet*, 686 F.2d at 1252; *E.E.O.C. v. Elrod*, 674 F.2d at 605. Significantly, however, the 1974 legislative history embodies remarks made by President Nixon in 1972 in support of the same extension of coverage: [5]

> Discrimination based on age—what some people call 'age-ism'—can be as great an evil in our society as discrimination based on race or religion or any other characteristic which ignores a person's unique status as an individual and treats him or her as a member of some arbitrarily-defined group. Especially in the employment field, discrimination based on age is cruel and self-defeating; it destroys the spirit of those who want to work and it denies the National [sic] the contribution they could make if they were working.

H.R.Rep. No. 93–913, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 2811, 2849. Senator Bentsen, who sponsored these across-the-board changes in 1972, remarked on the occasion of the enactment of the 1974 ADEA amendment: "The passage of this measure insures that government employees will be subject to the same protections against arbitrary employment [discrimination] based on age as are employees in the private sector." 120 Cong.Rec. 8768 (1974), *reprinted in E.E.O.C. v. Elrod*, 674 F.2d at 605. In a report issued between the introduction of this ADEA amendment (1972) and its ultimate passage (1974), the Senate Special Committee on Aging reflected that "[t]here is ... evidence that, like the corporate world, government managers also create an environment where young is sometimes better than old." Senate Special Committee on Aging, Improving the Age Discrimination Law, 93d Cong., 1st Sess., 14 (Comm.Print

1973), Leg.Hist. 215, 231, quoted in *E.E.O.C. v. Wyoming,* 103 S.Ct. at 1059.

This legislative history, albeit scanty, nonetheless makes it plain that Congress' purpose in extending ADEA coverage was to shield public employees from the invidious effects of age-based discrimination. The 1974 amendment, like the ADEA itself, "is aimed at irrational, unjustified employment decisions based upon assumptions about the relationship between age and ability which classify older workers as incapable of effective job performance." *E.E.O.C. v. Elrod,* 674 F.2d at 605. *See* 29 U.S.C. § 621. This proscription of vagarious sovereign conduct is of a genre which, by any logical standard, falls well within the category of "appropriate legislation" under section 5 of the Fourteenth Amendment as set forth in *Ex parte Virginia,* 100 U.S. at 345–46. *See Katzenbach v. Morgan,* 384 U.S. at 648, 86 S.Ct. at 1722; *E.E.O.C. v. Elrod,* 674 F.2d at 604. It comes, therefore, as no surprise to find that the majority of courts which have squarely confronted this issue have reached the same conclusion. *E.g., E.E.O.C. v. County of Calumet,* 686 F.2d at 1253; *E.E.O.C. v. Elrod,* 674 F.2d at 604; *Arritt v. Grisell,* 567 F.2d 1267, 1271 (4th Cir.1977); *E.E.O.C. v. County of Los Angeles,* 526 F.Supp. 1135, 1137–38 (C.D. Cal.1981); *Johnson v. Mayor of Baltimore,* 515 F.Supp. 1287, 1292 (D.Md.1981), *cert. denied,* 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982); *Carpenter v. Pennsylvania Liquor Control Bd.,* 508 F.Supp. 148, 149 (E.D.Pa.1981); *E.E.O.C. v. Pennsylvania Liquor Control Bd.,* 503 F.Supp. 1051, 1053 (M.D.Pa.1980); *Marshall v. Delaware River and Bay Authority,* 471 F.Supp. 886, 891 & n. 7 (D.Del.1979); *Remmick v. Barnes County,* 435 F.Supp. 914, 916 (D.N.D.1977); *Aaron v. Davis,* 424 F.Supp. 1238, 1241 & n. 2 (E.D.Ark.1976); *Usery v. Board of Educ. of Salt Lake City,* 421 F.Supp. 718, 721 (D.Utah 1976). And, while all of these decisions antedate *E.E.O.C. v. Wyoming, supra,*

---

**5.** Legislation elongating the ADEA to extend to government employees was first introduced in March, 1972, simultaneous with Congress' consideration and passage of amendments to Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. § 2000e, *et seq.* ("Title VII"), which conferred coverage under Title VII upon state and local government employees. *E.E.O.C. v. Elrod,* 674 F.2d at 604.

the vibrations emanating from the Supreme Court's opinion in that case are compatible with this view.

We are further persuaded that Congress enacted the 1974 ADEA amendment pursuant to its section 5 powers by comparing the ADEA with Title VII, its closest legislative parallel. *See Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *E.E.O.C. v. Elrod,* 674 F.2d at 607. When originally enacted, Title VII was explicitly bottomed upon the Commerce Clause and implicated only private conduct. 42 U.S.C. § 2000e. *See* S.Rep. No. 872, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.Code Cong. & Ad.News 2355, 2366–68. Congress referred specifically to section 5 of the Fourteenth Amendment, however, when it amended Title VII in 1972 so as to cover state and local employees. *E.E.O.C. v. Elrod,* 674 F.2d at 607; H.R.Rep. No. 92–238, 92d Cong., 2d Sess., *reprinted in* 1972 U.S. Code Cong. & Ad.News 2137, 2154.

The ADEA, like Title VII, initially covered only proprietary conduct and included in its preamble findings sufficient to predicate the legislation on the Commerce Clause. 29 U.S.C. § 621(a)(4). *See E.E.O.C. v. Elrod,* 674 F.2d at 607. As previously mentioned, an effort to extend the ADEA's coverage to state employees was first mounted in 1972 when a kindred amendment to Title VII was being contemplated. *See* note 5, *ante.* While the enlargement of the scope of Title VII skipped through the halls of Congress at a tarantella tempo, the enactment promenade was more protracted in the ADEA configuration. Yet, when finally passed in 1974, the only manner in which the ADEA amendment materially differed from the parallel Title VII modification was in its failure specifically to intone the Fourteenth Amendment. *See E.E.O.C. v. Elrod,* 674 F.2d at 607–08. Nothing in the legislative history suggests that this omission represented a conscious congressional relinquishment of its section 5 authority, or that the ADEA's more leisurely parliamentary pavane somehow lost the Fourteenth Amendment beat that had so plainly characterized approval of the comparable Title VII changes. The striking substantive similarity between the two acts militates strongly in favor of the conclusion that the identical reservoir of congressional power was the well-spring for both. *Accord* at 607.

We hold, therefore, that the 1974 amendment to the ADEA was adopted pursuant to Congress' power under section 5 of the Fourteenth Amendment.

### III.

█ The next question becomes whether, in legislating pursuant to its section 5 powers, Congress evinced sufficient intent to abrogate the immunity conferred by the Eleventh Amendment. *See Fitzpatrick v. Bitzer,* 427 U.S. at 452, 96 S.Ct. at 2669; *Edelman v. Jordan,* 415 U.S. at 672, 94 S.Ct. at 1360. As the Supreme Court made manifest in *Fitzpatrick,* Congress has plenary power to set aside the states' immunity from retrospective relief in order to enforce the Fourteenth Amendment. *Hutto v. Finney,* 437 U.S. 678, 693, 98 S.Ct. 2565, 2574, 57 L.Ed.2d 522 (1978). Such power is a vital adjunct of the explicit grant to Congress, enmeshed in section 5 of the Fourteenth Amendment, of authority to enforce the amendment's substantive imperatives (which themselves significantly limit state suzerainty). *Fitzpatrick v. Bitzer,* 427 U.S. at 456, 96 S.Ct. at 2671. Where, as here, Congress enacts "appropriate legislation" in order to foster the Fourteenth Amendment and its commands to the states, it may, expressly or by fair implication, provide for private suits against states or state officials which would be constitutionally impermissible in other contexts. *Id.*

█ In *Fitzpatrick,* the Supreme Court held that, in enacting the 1972 amendments to Title VII, Congress intended to override the states' Eleventh Amendment immunity, noting that the statute made unequivocal reference to the availability of private actions against state and local governments. 427 U.S. at 452, 96 S.Ct. at 2669. This " 'threshold fact of congressional authorization' ... to sue the State as employer" *id., quoting Edelman v. Jordan,* 415 U.S. at 672, 94 S.Ct. at 1360, is palpably present in the

ADEA as well. *See* 29 U.S.C. § 630(b); 29 U.S.C. § 623; 29 U.S.C. § 626. Given that the relevant revision to the ADEA was enacted in pursuance of the Fourteenth Amendment, *see* text *ante,* the present case is in this respect indistinguishable from *Fitzpatrick;* and here, too, we must hold that the ADEA's express authorization for the maintenance of suits against state employers comprises adequate evidence to demonstrate the congressional will that Eleventh Amendment immunity be abrogated.[6] The district court therefore erred in dismissing, on the basis of defendants' putative Eleventh Amendment immunity, the appellant's action for back pay and damages.

For the foregoing reasons, the judgment of the district court is vacated, and the cause is remanded to the district court for further proceedings.

*So ordered.*

---

**6.** *See Hutto v. Finney,* 437 U.S. at 694, 98 S.Ct. at 2575, where the Supreme Court held that Congress overrode Eleventh Amendment immunity in enacting the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (the "Act"), because the Act applies to "any" action brought to enforce certain civil rights laws, including 42 U.S.C. 1983, without any exception for the defense by the states of injunction actions. Under the *Hutto* criterion, there are ample indications of intent in the ADEA to override the Eleventh Amendment. *See Quern v. Jordan,* 440 U.S. at 343–45, 99 S.Ct. at 1146–47.