James A. SMITH

v.

**RHODE ISLAND STATE SERVICES FOR the BLIND AND VISUALLY HANDICAPPED and Terrell H. Bell in his capacity as Secretary of Education.**

Civ. A. No. 83–0292 S.

United States District Court,
D. Rhode Island.

March 2, 1984.

Lovett, Morgera, Schefrin & Gallogly, Ltd. by Aram R. Schefrin and Marc B. Gursky, Providence, R.I., for plaintiff.

Dennis J. Roberts, II, Atty. Gen., William M. Walsh, Sp. Asst. Atty. Gen., Robert J. Fallon, Chief Legal Counsel, Dept. of Social and Rehabilitative Services, State of Rhode Island, Providence, R.I., for Rhode Island State Services.

Lincoln C. Almond, U.S. Atty., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for Terrell H. Bell.

## OPINION AND ORDER

SELYA, District Judge.

This is an action brought by James A. Smith, a licensed blind vendor, against Rhode Island State Services for the Blind and Visually Handicapped [1] and Terrell H. Bell, in his capacity as United States Secretary of Education, pursuant to 20 U.S.C. § 107d–2(a). Plaintiff appeals from a decision rendered by an *ad hoc* arbitration panel convened by the Secretary in accordance with the two-step grievance procedure provided for under the Randolph-Sheppard Act, as amended, 20 U.S.C. § 107 *et seq.* (the "Act").[2] The Act established a cooperative federal/state scheme to enlarge economic opportunities for the blind through the training and licensure of visually impaired persons to operate vending facilities

---

1. The state defendant is named in the complaint by one of its wonted sobriquets. More formally, this agency is known as the Division of Services for the Blind and Visually Impaired of the Rhode Island Department of Social and Rehabilitative Services ("SRS"). The state defendant is the "state licensing agency" contemplated by the Act, *e.g.*, 20 U.S.C. § 107a(a)(5), and will sometimes be referred to herein as "RISB".

2. 20 U.S.C. § 107d–1(a) provides:
    Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing, which shall be provided by such agency in accordance with section 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such

hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 107d–2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

20 U.S.C. § 107d–2(a) provides:
    Upon receipt of a complaint filed under *section 107d–1 of this title, the Secretary shall convene an ad hoc arbitration panel as provided in subsection (b) of this section. Such panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5 [the Administrative Procedure Act].*

on government property. 20 U.S.C. § 107. Responsibility for administering the program is apportioned between the federal and state governments. *See* 20 U.S.C. § 107a. The federal Rehabilitative Services Administration is principally responsible for carrying out the overall mandates of the Act, 20 U.S.C. § 107a(a)(1), and the program is administered at the local level by state licensing agencies designated pursuant to 20 U.S.C. § 107a(a)(5).

Under neoteric federal regulations, an application for designation as a state licensing agency must contain a plan outlining the rules and regulations applicable to the state's blind vendor program, including rules relating to the transfer and promotion of licensees. 34 C.F.R. §§ 395.3, 395.5. In accordance with this requirement, RISB conceived, incubated, nurtured and thereafter submitted an ichnographic masterpiece yclept "Baby Randolph" as an adjunct to RISB's application for redesignation as a state licensing agency during the winter of 1979–1980. The rule governing the method of selection, transfer and promotion of blind vendors is found in Attachment IX–A, Paragraph C.1 of that plan. That section provides in substance that the transfer and promotion of vendors shall be based upon seniority, and outlines the method by which seniority is to be calculated.

In the present case, Smith disputes an arbitration panel's refusal to find that, under the applicable seniority rules, he (rather than one Ruth McGarrity) should have been awarded Stand # 54 at the Garrahy Judicial Complex in Providence, Rhode Island. Pursuant to conferences with the court held on November 22, 1983 and December 1, 1983, respectively, the parties agreed to submit this case for decision on the administrative record, augmented by briefs. The final such submission was received on January 23, 1984. Reasoned consideration of the issues involved in this appeal requires, at the outset, perscrutation of the material facts as limned by the record below.

## I.

The plaintiff first began working in Rhode Island's blind vendor program in 1962, and was licensed three years later when he reached the age of twenty-one. Smith continuously participated in the program from the time of his initial assignment to the present, during which period he has worked at six different stands located in various buildings in the Providence area. During the major portion of Smith's tenure, he operated what is commonly referred to as a "profit/loss stand." Under such an arrangement, a vendor is allowed to share in the profits of the enterprise; and concomitantly, is chargeable for some or all of the losses incurred. A licensing contract is generally drawn up to commemorate the rights and obligations of the parties with respect to a particular stand.

There were, however, several intervals within which Smith did not do business as a profit/loss vendor. During the period before he was licensed and during a subsequent time span from November 2, 1972 through December of 1976, Smith worked at an "agency stand." In that capacity, the plaintiff was paid a salary based on minimum wage. He was neither directly concerned with, nor affected by, profit or loss; and he held no licensing contract. Smith's change in status in the fall of 1972 came about as a result of discussions between him and representatives of RISB. During this dialogue, agency personnel informed Smith that he had incurred a substantial operating debt; and that, consequently, he could not continue to operate on a profit/loss basis. Beset by a sea of red ink, the plaintiff agreed to move to a different stand and to become a salaried employee. Apart from this change in the economic relationship between Smith and RISB, Smith's job remained virtually the same. The plaintiff continued throughout to perform the managerial functions attendant to running a vending facility including ordering supplies, training new employees, and paying bills. Noone told Smith that his time in service at an agency stand would

not count towards seniority in the blind vendor program.

In approximately 1977, in response to newly enacted federal regulations, RISB began developing a state plan of rules and regulations for the Rhode Island blind vendor program. In furtherance of this end, E. Lyman D'Andrea, RISB's chief executive, met with representatives of the Associated Blind Vendors of Rhode Island (the "Association").[3] Thereafter, subcommittees of the Association were formed to develop recommendations with respect to various aspects of the state plan (including proposed rules and regulations applicable thereto).

One of these panels (the "Committee"), chaired by McGarrity, was concerned with transfer and promotion, an area which included the definition and mode of calculation of seniority. The Committee solicited a list of vendor names and corresponding dates of licensure from RISB. The testimony was murky as to what document(s) the Committee actually received in response to its request. In any event, the group eventually compiled a new seniority list on which the plaintiff was credited with less time than McGarrity, reflective of the fact that the time Smith had worked at an agency stand was not counted. The Committee also drew up a proposal as to transfers and promotions, which included a statement that "[s]eniority shall be based upon the years of service with contract followed (*sic*) by blind workers and trainees."

Neither the list nor the proposed seniority rule was ever formally communicated to the Association through official channels. McGarrity claims, however, that both the list and the Committee's proposals were sent out to all blind vendors along with an invitation to notify McGarrity of any erroneous information contained in the rota.

In contrast to McGarrity's testimony, however, both the plaintiff (who was vice-president of the Association at the time) and the president then in office maintain that they never received anything from the Committee.

In the late spring of 1979, the Association held a series of meetings at which various portions of the state plan were discussed among the membership. The testimony was inconsistent and confusing, however, with respect to whether, and/or to what extent, the seniority rules were addressed. For example, Barry Humphries, one of the Committee members, stated that the McGarrity mailing was discussed during a meeting of the general membership held on June 21, 1979; but he was unable to testify as to the content of that discussion. In contrast, Robert Moreau, another Committee member, avouched that the proposed seniority rule was never discussed by the membership of the Association as a whole after the Committee had transmitted its proposal. Yet another version was offered by the then president of the Association, Mary Scurka, who stated that any discourse which took place vis-a-vis the proposed seniority policy was general only, and never focused upon the exclusion of time spent at an agency stand.[4] D'Andrea contradicted both Moreau and Scurka, and went well beyond Humphries: he insisted that he (presumably during this same time period) not only descanted on the proposed seniority rule, but in fact specifically explained how it would differentiate between time logged at an agency stand and time worked under contract at a profit/loss stand. The state rules and regulations were eventually promulgated and subsequently approved by the federal government. Article IX, entitled "Selection, Transfer and Promotion of Vendors" read as follows:

---

**3.** Under the Act, the state licensing agency is required to provide for a State Committee of Blind Vendors (the "SCBV") which represents the interests of all blind vendors within its boundaries. 20 U.S.C. § 107b–1; 34 C.F.R. § 395.14. In Rhode Island, the Association functions as the SCBV.

**4.** Indeed, both Scurka and the plaintiff maintain that they had absolutely no idea that such a distinction would be made until the present controversy arose.

The S.L.A. [State Licensing Agency] with the active participation of the State Committee of Blind Vendors, hereby establishes a selection, transfer and promotion system for vendors which will be uniformly applied to all vendor vacancies that develop or occur in the vending facilities program as outlined in Attachment IX–A.

Attachment IX–A, Paragraph C.1 addressed the method of selection, transfer and promotion of vendors in the following verbiage:

In accordance with the standards as outlined in Paragraphs A and B, the selection, transfer and promotion of vendors shall be based upon seniority. The S.L.A. shall establish and maintain a roster containing the name of each vendor, the date of his or her original licensing, any subsequent date(s) of relicensing and their vending facility address. Seniority, then, shall be calculated from the original date of licensing which shall be multiplied by the number of months during which the vendor was assigned and licensed to operate any vending facility which has been established by this S.L.A.

The present controversy concerns the application of these provisions in connection with the competitive bidding between the plaintiff and McGarrity for Stand # 54 at the Garrahy Judicial Complex. Anticipating the opening of the new facility, RISB began soliciting bids for this locus in approximately May of 1981. As part of that process, the agency compiled an updated seniority roster, wherein Smith was ranked junior to McGarrity. RISB transmitted the list to members of the Association, along with the following explanation:

The determination as to continuity of seniority and the length of seniority of each blind vendor is based upon information taken from profit and loss statements drawn at times of inventory, which are on file at the S.L.A. Such P/L [profit/loss] Statements give evidence as to whether or not a blind vendor was in fact licensed and assigned to operate a certain facility by virtue of being charged to pay all debts and collect all earnings of that certain facility during a particular inventory period, whereupon, seniority has been credited to the vendor so charged.

Whenever the P/L Statement indicates that a facility was "Agency Operated", meaning that the S.L.A. was charged to pay all debts and collect all earnings during a particular inventory period, no seniority was therefore credited to a blind vendor even though he or she may have been serving as employee of the S.L.A. at the facility in question ...

Exhibit 5.

Several witnesses, including the plaintiff, testified that they were startled to receive this document. They asserted that it constituted their initial notice that only time served as a profit/loss vendor accrued towards seniority. Each of these witnesses claimed that the gravamen of the transmittal had never theretofore been made known to them in any way, shape or form.

On the basis of the 1981 roster, Stand # 54 was awarded to McGarrity (both she and the plaintiff having entered bids). Smith appealed from that decision, claiming that agency employment should have been counted; and that, had this been done, he would be senior to McGarrity and would have preference over her for the concession. A hearing was held on December 28, 1981 before James H. Reilly, deputy director of SRS. The hearing officer determined that the state plan had been adopted after consultation with the Association and in accordance with applicable federal regulations. Noting the language of Attachment IX–A, the hearing officer further found that RISB's interpretative ruling (that time served as a salaried, non-contractual employee at an agency stand should be excluded in computing seniority) was not unreasonable. Lastly, Reilly rejected Smith's lack-of-notice contention (*i.e.*, that he had never understood that such a distinction would be made) as incredible. Given these findings, the hearing officer refused to disturb RISB's award of Stand # 54 to McGarrity.

Smith appealed that decision to an arbitration panel pursuant to 20 U.S.C. § 107d–2. Following a plenary evidentiary hearing, the majority of the panel[5] declined to oust McGarrity or to bestow the vending facility at the Garrahy Judicial Complex upon Smith; and, moreover, rejected his claim for monetary damages. But, while reaching a similar result, the panel did not rubber-stamp Reilly's reasoning. Rather, the arbitrators determined that the seniority rules as promulgated by RISB were ambiguous; that the level of participation by members of the Association in the formulation of the rules had been unacceptably low under the Act and the applicable federal regulations,[6] and that the intent of the blind vendors with respect to the application of Attachment IX–A, Paragraph C.1 was totally inscrutable. In these straitened circumstances, the panel concluded that the matter ought properly to be remanded to allow the Association and its members, on the one hand, and RISB, on the other hand, to decide, after due consideration, what kind of seniority system was most appropriate. The arbitrators therefore ordered RISB to propose a detailed seniority scheme to the Association; and thereafter to adopt, with the participation of the SCBV, a clear and unambiguous policy. Time limits were fixed within which RISB was to take these steps. The arbitrators specified that McGarrity was to remain *in situ* pending a permanent award of Stand # 54 in accordance with the emergent transfer/promotion/seniority rules. And, as to the plaintiff's prayer for monetary redress, the panel opined that, regardless of which seniority guideline ultimately was ratified, Smith's claim for damages was unduly speculative and thus deserving of rejection.

Smith, displeased with the arbitrators' reasoning and the result thereof, thereupon filed this action. Since the panel rendered its decision, however, a number of events have occurred which merit mention. First, in an effort to effect compliance with the award, RISB submitted several proposed seniority rules to the Association. The Association voted on the proposals but, rent by internal dissension, failed to arrive at a consensus. The matter then was submitted to the Advisory Council for the Blind and Visually Impaired, an SRS advisory body appointed by the Governor of Rhode Island. *See* R.I.Gen.Laws § 40–9–3. Although the record before this court is bleary, the Advisory Council has apparently rendered a policy statement of sorts with respect to seniority. Moreover, subsequent to the panel's action, Smith bid for and was

---

**5.** The arbitration tribunal comprised three members: one selected by Smith; one selected by RISB; and the third chosen jointly by Smith and RISB. The panel's decision (March 16, 1983) was by a two-to-one vote, Smith's nominee declining concurrence. Since no formal dissent was filed, this court will hereafter refer to the panel majority as the "panel" or the "arbitrators"; and all references to the panel's decision or to the arbitrators' decision will be to the written award signed by the panel majority.

**6.** 20 U.S.C. § 107b–1 provides in relevant part that:

In addition to other requirements imposed in this title and in this chapter upon State licensing agencies, such agencies shall...

(3) insure that such committee's responsibilities include (A) participation, with the State agency, in major administrative decisions and policy and program development ... (C) participation, with the State agency, in the development and administration of a transfer and promotion system for blind licensees...

34 C.F.R. § 395.14 provides in relevant part that:

(b) The State Committee of Blind Vendors shall:

(1) Actively participate with the State licensing agency in major administrative decisions and policy and program development decisions affecting the overall administration of the State's vending facility program...

(3) Actively participate with the State licensing agency in the development and administration of a State system for the transfer and promotion of blind vendors...

34 C.F.R. § 395.7 provides in relevant part that:

(c) The State licensing agency shall further establish in writing and maintain policies which have been developed with the active participation of the State Committee of Blind Vendors and which govern the duties, supervision, transfer, promotion, and financial participation of the vendors. The State licensing agency shall also establish procedures to assure that such policies have been explained to each blind vendor.

awarded a vending facility at the newly-constructed Federal Center in Providence. He has professed a desire to remain there in preference to Stand # 54, and he no longer seeks to evict McGarrity from her demesne. Plaintiff's Brief at 16. He continues, however, to press his claims for monetary damages and for modification of the seniority list to reflect what he asserts is his proper rank.

## II.

The plaintiff challenges the panel's decision on a number of different grounds. With respect to its refusal to cede Stand # 54 to him, Smith first contends that the panel's finding of ambiguity anent the language in Paragraph C.1 of Attachment IX–A was not supported by substantial evidence. Smith argues, alternatively, that even if that finding was correct, the panel's failure to rule as to the proper construction of the state's seniority rule was arbitrary and capricious, an abuse of discretion, and, for good measure, in derogation of its duty under arbitration law to resolve with finality all of the issues presented to it. Lastly, Smith avers that the arbitrators abused their discretion in rejecting his claim for monetary balm.[7]

## III.

In order adequately to address Smith's claims, the proper standard of review must be delineated. As noted previously, *see* note 2, *ante*, 20 U.S.C. § 107d–2(a) provides that the arbitration award is subject to review as a final agency action in pursuance of the applicable provisions of the Administrative Procedure Act (the "APA").[8] Under 5 U.S.C. § 706, a court may set aside agency action only if it is found to be:

(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(b) contrary to constitutional right, power, privilege, or immunity;

(c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(d) without observance of procedure required by law; or

(e) unsupported by substantial evidence. *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 689 F.2d 1112, 1117 (1st Cir.1982); *Grand Islander Health Care Center, Inc. v. Heckler,* 573 F.Supp. 405, 410 (D.R.I.1983); *Georgia Department of Human Resources v. Bell,* 528 F.Supp. 17, 21–22 (N.D. Ga.1981).

Acknowledging that the general standard of review for cases arising under the APA has specifically been woven into the fabric of the Randolph-Sheppard Act, the plaintiff nevertheless contends that this court must simultaneously be guided by the "general requirement" that an arbitration ruling demands vacatur when arbitrators have so imperfectly executed their power that a final and definite award was not made.[9] There is, however, little to

---

7. Plaintiff also disputes the propriety of the rulemaking which allegedly has taken place in purported compliance with the arbitration award. Judicial review of administrative action, however, is limited to issues which the administrative body has duly considered. *U.S. ex rel. Barbour v. District Director of the Immigration and Naturalization Service,* 491 F.2d 573, 576–77, *cert. denied,* 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *California Interstate Telephone Co. v. Federal Communications Commission,* 328 F.2d 556, 559 (D.C.Cir.1964). The agency's grievance process has not been exhausted (nor indeed even initiated, for aught that appears of record here) with respect to the post-award rulemaking. Thus, this remonstrance is not properly before the court.

8. Chapter 7 of Title 5 has been codified at 5 U.S.C. § 701 *et seq.*

9. The plaintiff cites numerous cases in which that shibboleth has been set forth. *E.g., Michaels v. Mariforum Shipping,* 624 F.2d 411, 414 (2nd Cir.1980) (applying the Federal Arbitration Act); *Dutson v. Nationwide Mutual Insurance Co.,* 119 R.I. 801, 806, 383 A.2d 597, 600 (1978) (applying the Rhode Island Arbitration Act); *Garstka v. Russo,* 37 Wis.2d 146, 149–50, 154 N.W.2d 286, 287–88 (1967) (applying Wisconsin common law of arbitration).

commend such a view in the Randolph-Sheppard context. As an initial matter, the plaintiff has come forward with absolutely no precedent to support his position; and, in the one case this court has found in which a court reviewed an arbitration award pursuant to 20 U.S.C. § 107d–2(a), the standard applied was solely that delineated in the APA. *See Georgia Department of Human Resources v. Bell,* 528 F.Supp. at 21–22. Secondly, to accept plaintiff's argument that generic principles of arbitration law have *sub silentio* infiltrated the Act in some occult manner would render the language of 20 U.S.C. § 107d–2(a) (which specifically directs the use of the litmus test formulated in 5 U.S.C. § 706) confusing, if not meaningless. Finally, the policy underlying application of the principle of finality in the traditional arbitration milieu is simply inapposite to grievances brought pursuant to the Randolph-Sheppard Act.[10]

### IV.

Having delineated the appropriate standard of review, the court now turns to the merits of plaintiff's contentions. Smith asseverates that the panel's finding of ambiguity anent the seniority rule contained in Attachment IX–A was not supported by substantial evidence; and further, that even if such a finding was warranted, the panel's failure to pass upon the correct interpretation of that provision was both vagarious and characterized by abuse of discretion.

It cannot be gainsaid that the scope of the court's review under the APA is limited. Although the court's scrutiny of the facts must be exacting, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Broaden v. Harris,* 451 F.Supp. 1215, 1225 (W.D.Pa.1978), it is, under the astrictive standard which obtains, empowered neither to reweigh the evidence nor to replace the agency's judgment with its own. *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823; *Houston Lighting & Power Co. v. United States,* 606 F.2d 1131, 1141 (D.C.Cir.1979); *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980); *C.A. White Trucking Co. v. United States,* 555 F.2d 1260, 1264 (5th Cir.1977); *Grand Islander,* 573 F.Supp. at 412. Accordingly, "[a]dministrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis." *Plaza Bank v. Board of Governors of the Federal Reserve System,* 575 F.2d 1248, 1250 (8th Cir.1978). And, substantial evidence has been defined as " 'more than a mere scintilla [—].... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Appelyard's Motor Transportation Co. v. Interstate Commerce Commission,* 592 F.2d 8, 9 (1st Cir.1979) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)). *See also Miranda v. Secretary of Health, Education & Welfare,* 514 F.2d 996, 998 (1st Cir.1975) (same).

With these tenets in mind, the panel's finding with respect to the ambiguity of the language contained in the state's seniority rule is patently supported by constitutive evidence. Attachment IX–A, paragraph C.1 states merely that "[s]eniority ... shall be calculated from the original date of licensing which shall be multiplied by the number of months during which the vendor was assigned and licensed to operate any vending facility ..."; it in no way

---

**10.** In the ordinary case, arbitration is a freely chosen alternative to avoid the expense and delay inherent in the litigation process. *See Fukaya Trading Co. v. Eastern Marine Corp.,* 322 F.Supp. 278, 281 (E.D.La.1971); *R.E. Bean Construction Co. v. Middlebury Associates,* 139 Vt. 200, 204, 428 A.2d 306, 309 (1980). As such, the finality rule developed to reflect the presumed intentions of the parties and the perceived desire, all around, to have the arbitrators completely settle the matter. *Id.* at 210, 428 A.2d at 312. *Cf. Galt v. Libbey-Owens-Ford Glass Co.,* 397 F.2d 439, 442 (7th Cir.), *cert. denied,* 393 U.S. 925, 89 S.Ct. 258, 21 L.Ed.2d 262 (1968). Thus, the rule requiring that a final and definite award be made evolved as one of the narrow exceptions to the generally broad presumption in favor of arbitral awards. *See Confinco, Inc. v. Barrie & Bros., N.V.,* 395 F.Supp. 613, 615 (S.D.N.Y.1975).

explains whether time spent at an agency stand is, or is not, to be credited. Indeed, D'Andrea, the author of the rule, admitted in an outburst of candor that its language was "nebulous."[11] Furthermore, the fact that the present dispute arose is itself some evidence that the language contained in the rule is less than a model of clarity. And, the record is replete with evidence (which the panel dissected in some detail) demonstrating that various members of the Association held, and continue to hold, widely divergent beliefs with regard to its intended scope, dating back to the time when the rule was first written.

■ Moreover, there is ample evidence in the record to support the panel's subsidiary finding (one which the plaintiff does not dispute) that the Association and its members did not actively participate in the development of the state's seniority policy and that the rulemaking process thus failed to conform to the standard mandated by the applicable statutory provisions and regulations.[12] Like the Food Stamp Program, *Levesque v. Block*, 723 F.2d at 183 n. 4, the Randolph-Sheppard Act is "dependent, practically if not legally, on regulations for its administration." And, the federal defendant's regulations, promulgated pursuant to, *inter alia*, 20 U.S.C. §§ 107a(a)(1), 107a(b), expressly mandated meaningful participation by blind vendors in this process. *E.g.*, 34 C.F.R. §§ 395.7(c), 395.14(b). Under these circumstances, the rulemaking undertaken by a state licensing agency in disregard of the federal mandate resulted only in rules which were, upon challenge, no rules at all. Hence, this subsidiary finding, without more, warranted the arbitrators' decision.

■ Having reached these conclusions, the panel found itself faced with a rule containing irrefragably vague language,

and utterly bereft of any reliable means for discerning the underlying intent of the framers thereof. To compound the problem further, the edict had been promulgated in derogation of policies lying at the core of the statutory scheme. Given the full panoply of the antecedent facts, the arbitrators' directions (designed to ensure full and knowledgeable participation in the drafting of a new rule by those most affected by the resolution of the dispute) were neither arbitrary nor capricious; and, most assuredly, were not characterized by an abuse of discretion.

## V.

■ Plaintiff's final claim, namely, that the panel acted improperly in denying his attempt to garner back pay, stands on a different footing. Smith does not contest the finding that he failed to present adequate evidence to establish his claim for monetary relief. Instead, he all but admits that there was not sufficient evidence upon which the panel could have rendered a monetary award. *See, e.g.*, Plaintiff's Brief at 19. In an effort to confess and avoid, however, he seems to contend that he should not have been precluded from attempting to make out his claim at a later date.

As an initial matter, the court is not at all persuaded that the arbitrators should have reached the issue of damages, especially since the award was neither final nor dispositive with respect to liability. Moreover, serious Eleventh Amendment concerns, *see, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 451–52, 96 S.Ct. 2666, 2669, 49 L.Ed.2d 614 (1976); *Ramirez v. Puerto Rico Fire Service*, 715 F.2d 694, 697 (1st Cir.1983); *Georgia Department of Human Resources v. Bell*, 528 F.Supp. at 26[13], and

---

**11.** In administrative law matters, a reviewing court may take cognizance of what an agency believed it was doing when it enacted a rule. *British Caledonian Airways v. CAB*, 584 F.2d 982, 992 (D.C.Cir.1978). While the agency's *post-hoc* views are not entitled to the same consideration, *Levesque v. Block*, 723 F.2d 175, 180

(1st Cir.1983), they are nevertheless of some interest.

**12.** *See* note 6, *ante*.

**13.** In *Georgia Department of Human Resources v. Bell*, a case brought under the Act, the court held that the Eleventh Amendment barred a

sovereign immunity questions, *see, e.g., United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *Seveney v. United States,* 550 F.Supp. 653, 656 (D.R.I.1982), are implicated by, and quite probably dispositive of, this claim for monetary redress.

While comment upon the damage claim may, for these reasons, be viewed as supererogatory, the court notes that all parties have briefed the damage aspect; and therefore, the court will address it briefly. On the present record there is little doubt that Smith's claim of entitlement to damages rests upon ground too shaky to sustain it. It is axiomatic that the administrative process cannot allow for reopening of the record every time a dissatisfied litigant comes forward with new facts that were not previously before the agency. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 554–55, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978); *Nance v. Environmental Protection Agency,* 645 F.2d 701, 717 (9th Cir.), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). And, it is equally clear that an agency's refusal to reopen a particular proceeding can only be set aside if it is characterized by an abuse of discretion. *Id.*

The facts of the present case do not support such a finding. Unlike *Grimm v. Brown,* 291 F.Supp. 1011 (N.D.Cal.1968), *aff'd,* 449 F.2d 654 (9th Cir.1971), the plaintiff does not assert that he was unfairly denied access to information necessary to prosecute his claim. Nor does he aver that subsequent to the evidentiary hearing new facts have arisen which should be considered. *E.g., Nance v. Environmental Protection Agency, supra.* To the contrary, having made no apparent effort to acquire the data necessary to establish his claim for monetary relief (which, if one accepts the plaintiff's assertions, is, and has been, readily available) nor to present his claim before the arbitrators, Smith nonetheless argues in this court that a reopening of the proceedings should be allowed. But, having dragged his heels, the

vendor's claim for damages against two state

plaintiff's request for reconsideration has a hollow ring; there is no basis proffered upon which this court could, in conscience, allow him to do so. To the extent that his claim for damages was properly before the arbitration panel, the dearth of evidence presented by the claimant left the arbitrators little rational choice but to deny it.

### VI.

For these reasons, the plaintiff's complaint must be, and it hereby is, denied and dismissed. While the court has some sympathy for Smith's unwitting ensnarement in a snarled web of ill-constructed bureaucratic red tape, not of his own making, the task of unravelling that tangled skein was properly remanded by the arbitration panel to the state licensing agency.

*So ordered.*